## LEE ET AL. *v.* WEISMAN, PERSONALLY AND AS NEXT FRIEND OF WEISMAN

No. 90–1014.   Argued November 6, 1991—Decided June 24, 1992

578

KENNEDY, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined. BLACKMUN, J., *post*, p. 599, and SOUTER, J., *post*, p. 609, filed concurring opinions, in which STEVENS and O'CONNOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and THOMAS, JJ., joined, *post*, p. 631.

*Charles J. Cooper* argued the cause for petitioners. With him on the briefs were *Michael A. Carvin, Peter J. Ferrara, Robert J. Cynkar, Joseph A. Rotella,* and *Jay Alan Sekulow.*

*Solicitor General Starr* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Gerson, Deputy Solicitor General Roberts, Deputy Assistant Attorney General McGinnis,* and *Richard H. Seamon.*

*Sandra A. Blanding* argued the cause for respondent. With her on the brief were *Steven R. Shapiro* and *John A. Powell.**

---

*Briefs of *amici curiae* urging reversal were filed for the Board of Education of Alpine School District by *Brinton R. Burbidge* and *Merrill F. Nelson;* for the Christian Legal Society et al. by *Edward McGlynn Gaffney, Michael J. Woodruff, Samuel E. Ericsson,* and *Forest D. Montgomery;* for the Clarendon Foundation by *Kemp R. Harshman* and *Ronald*

JUSTICE KENNEDY delivered the opinion of the Court.

School principals in the public school system of the city of Providence, Rhode Island, are permitted to invite members of the clergy to offer invocation and benediction prayers as part of the formal graduation ceremonies for middle schools and for high schools. The question before us is whether including clerical members who offer prayers as part of the official school graduation ceremony is consistent with the Religion Clauses of the First Amendment, provisions the Fourteenth Amendment makes applicable with full force to the States and their school districts.

---

*D. Maines;* for Concerned Women for America et al. by *James Matthew Henderson, Sr., Jordan Lorence, Mark N. Troobnick,* and *Thomas Patrick Monaghan;* for Focus on the Family et al. by *Stephen H. Galebach* and *Laura D. Millman;* for the Liberty Counsel by *Mathew D. Staver;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin* and *Dennis Rapps;* for the National Legal Foundation by *Robert K. Skolrood* and *Brian M. McCormick;* for the Rutherford Institute et al. by *John W. Whitehead, Alexis I. Crow, A. Eric Johnston, Stephen E. Hurst, Joseph Secola, Thomas S. Neuberger, J. Brian Heller, Amy Dougherty, David Melton, Thomas W. Strahan, Robert R. Melnick, William Bonner, Larry Crain, W. Charles Bundren,* and *James Knicely;* for Specialty Research Associates, Inc., et al. by *Jordan Lorence;* for the Southern Baptist Convention Christian Life Commission by *Michael K. Whitehead* and *James M. Smart, Jr.;* and for the United States Catholic Conference by *Mark E. Chopko* and *Phillip H. Harris.*

Briefs of *amici curiae* urging affirmance were filed for Americans for Religious Liberty by *Ronald A. Lindsay;* and for the American Jewish Congress et al. by *Douglas Laycock.*

Briefs of *amici curiae* were filed for the State of Delaware by *Charles M. Oberly III,* Attorney General of Delaware, *Michael F. Foster,* Solicitor General, *David S. Swayze,* and *David B. Ripsom;* for the Council on Religious Freedom et al. by *Lee Boothby, Robert W. Nixon, Walter E. Carson,* and *Rolland Truman;* for the Institute in Basic Life Principles by *Joe Reynolds;* for the National Coalition for Public Education and Religious Liberty et al. by *David B. Isbell* and *T. Jeremy Gunn;* and for the National School Boards Association by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon.*

I

A

Deborah Weisman graduated from Nathan Bishop Middle School, a public school in Providence, at a formal ceremony in June 1989. She was about 14 years old. For many years it has been the policy of the Providence School Committee and the Superintendent of Schools to permit principals to invite members of the clergy to give invocations and benedictions at middle school and high school graduations. Many, but not all, of the principals elected to include prayers as part of the graduation ceremonies. Acting for himself and his daughter, Deborah's father, Daniel Weisman, objected to any prayers at Deborah's middle school graduation, but to no avail. The school principal, petitioner Robert E. Lee, invited a rabbi to deliver prayers at the graduation exercises for Deborah's class. Rabbi Leslie Gutterman, of the Temple Beth El in Providence, accepted.

It has been the custom of Providence school officials to provide invited clergy with a pamphlet entitled "Guidelines for Civic Occasions," prepared by the National Conference of Christians and Jews. The Guidelines recommend that public prayers at nonsectarian civic ceremonies be composed with "inclusiveness and sensitivity," though they acknowledge that "[p]rayer of any kind may be inappropriate on some civic occasions." App. 20–21. The principal gave Rabbi Gutterman the pamphlet before the graduation and advised him the invocation and benediction should be nonsectarian. Agreed Statement of Facts ¶ 17, id., at 13.

Rabbi Gutterman's prayers were as follows:

"INVOCATION

"God of the Free, Hope of the Brave:

"For the legacy of America where diversity is celebrated and the rights of minorities are protected, we

thank You. May these young men and women grow up to enrich it.

"For the liberty of America, we thank You. May these new graduates grow up to guard it.

"For the political process of America in which all its citizens may participate, for its court system where all may seek justice we thank You. May those we honor this morning always turn to it in trust.

"For the destiny of America we thank You. May the graduates of Nathan Bishop Middle School so live that they might help to share it.

"May our aspirations for our country and for these young people, who are our hope for the future, be richly fulfilled.

AMEN"

"BENEDICTION

"O God, we are grateful to You for having endowed us with the capacity for learning which we have celebrated on this joyous commencement.

"Happy families give thanks for seeing their children achieve an important milestone. Send Your blessings upon the teachers and administrators who helped prepare them.

"The graduates now need strength and guidance for the future, help them to understand that we are not complete with academic knowledge alone. We must each strive to fulfill what You require of us all: To do justly, to love mercy, to walk humbly.

"We give thanks to You, Lord, for keeping us alive, sustaining us and allowing us to reach this special, happy occasion.

AMEN"

*Id.*, at 22–23.

The record in this case is sparse in many respects, and we are unfamiliar with any fixed custom or practice at middle school graduations, referred to by the school district as "promotional exercises." We are not so constrained with reference to high schools, however. High school graduations are such an integral part of American cultural life that we can with confidence describe their customary features, confirmed by aspects of the record and by the parties' representations at oral argument. In the Providence school system, most high school graduation ceremonies are conducted away from the school, while most middle school ceremonies are held on school premises. Classical High School, which Deborah now attends, has conducted its graduation ceremonies on school premises. Agreed Statement of Facts ¶ 37, *id.*, at 17. The parties stipulate that attendance at graduation ceremonies is voluntary. Agreed Statement of Facts ¶ 41, *id.*, at 18. The graduating students enter as a group in a processional, subject to the direction of teachers and school officials, and sit together, apart from their families. We assume the clergy's participation in any high school graduation exercise would be about what it was at Deborah's middle school ceremony. There the students stood for the Pledge of Allegiance and remained standing during the rabbi's prayers. Tr. of Oral Arg. 38. Even on the assumption that there was a respectful moment of silence both before and after the prayers, the rabbi's two presentations must not have extended much beyond a minute each, if that. We do not know whether he remained on stage during the whole ceremony, or whether the students received individual diplomas on stage, or if he helped to congratulate them.

The school board (and the United States, which supports it as *amicus curiae*) argued that these short prayers and others like them at graduation exercises are of profound meaning to many students and parents throughout this country who consider that due respect and acknowledgment for divine guidance and for the deepest spiritual aspirations of

our people ought to be expressed at an event as important in life as a graduation. We assume this to be so in addressing the difficult case now before us, for the significance of the prayers lies also at the heart of Daniel and Deborah Weisman's case.

B

Deborah's graduation was held on the premises of Nathan Bishop Middle School on June 29, 1989. Four days before the ceremony, Daniel Weisman, in his individual capacity as a Providence taxpayer and as next friend of Deborah, sought a temporary restraining order in the United States District Court for the District of Rhode Island to prohibit school officials from including an invocation or benediction in the graduation ceremony. The court denied the motion for lack of adequate time to consider it. Deborah and her family attended the graduation, where the prayers were recited. In July 1989, Daniel Weisman filed an amended complaint seeking a permanent injunction barring petitioners, various officials of the Providence public schools, from inviting the clergy to deliver invocations and benedictions at future graduations. We find it unnecessary to address Daniel Weisman's taxpayer standing, for a live and justiciable controversy is before us. Deborah Weisman is enrolled as a student at Classical High School in Providence and from the record it appears likely, if not certain, that an invocation and benediction will be conducted at her high school graduation. Agreed Statement of Facts ¶ 38, App. 17.

The case was submitted on stipulated facts. The District Court held that petitioners' practice of including invocations and benedictions in public school graduations violated the Establishment Clause of the First Amendment, and it enjoined petitioners from continuing the practice. 728 F. Supp. 68 (1990). The court applied the three-part Establishment Clause test set forth in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971). Under that test as described in our past cases, to satisfy the Establishment Clause a governmen-

tal practice must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion. *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 773 (1973). The District Court held that petitioners' actions violated the second part of the test, and so did not address either the first or the third. The court decided, based on its reading of our precedents, that the effects test of *Lemon* is violated whenever government action "creates an identification of the state with a religion, or with religion in general," 728 F. Supp., at 71, or when "the effect of the governmental action is to endorse one religion over another, or to endorse religion in general." *Id.*, at 72. The court determined that the practice of including invocations and benedictions, even so-called nonsectarian ones, in public school graduations creates an identification of governmental power with religious practice, endorses religion, and violates the Establishment Clause. In so holding the court expressed the determination not to follow *Stein* v. *Plainwell Community Schools*, 822 F. 2d 1406 (1987), in which the Court of Appeals for the Sixth Circuit, relying on our decision in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), held that benedictions and invocations at public school graduations are not always unconstitutional. In *Marsh* we upheld the constitutionality of the Nebraska State Legislature's practice of opening each of its sessions with a prayer offered by a chaplain paid out of public funds. The District Court in this case disagreed with the Sixth Circuit's reasoning because it believed that *Marsh* was a narrow decision, "limited to the unique situation of legislative prayer," and did not have any relevance to school prayer cases. 728 F. Supp., at 74.

On appeal, the United States Court of Appeals for the First Circuit affirmed. The majority opinion by Judge Torruella adopted the opinion of the District Court. 908 F. 2d 1090 (1990). Judge Bownes joined the majority, but wrote a separate concurring opinion in which he decided that the

practices challenged here violated all three parts of the *Lemon* test. Judge Bownes went on to agree with the District Court that *Marsh* had no application to school prayer cases and that the *Stein* decision was flawed. He concluded by suggesting that under Establishment Clause rules no prayer, even one excluding any mention of the Deity, could be offered at a public school graduation ceremony. 908 F. 2d, at 1090–1097. Judge Campbell dissented, on the basis of *Marsh* and *Stein.* He reasoned that if the prayers delivered were nonsectarian, and if school officials ensured that persons representing a variety of beliefs and ethical systems were invited to present invocations and benedictions, there was no violation of the Establishment Clause. 908 F. 2d, at 1099. We granted certiorari, 499 U. S. 918 (1991), and now affirm.

## II

These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.

This case does not require us to revisit the difficult questions dividing us in recent cases, questions of the definition and full scope of the principles governing the extent of permitted accommodation by the State for the religious beliefs and practices of many of its citizens. See *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573 (1989); *Wallace* v. *Jaffree,* 472 U. S. 38 (1985); *Lynch* v. *Donnelly,* 465 U. S. 668 (1984). For without reference to those principles in other contexts, the controlling precedents as they relate to prayer and religious exercise in primary and secondary public schools compel the holding here that the policy of the city of Providence is an

unconstitutional one. We can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured. Thus we do not accept the invitation of petitioners and *amicus* the United States to reconsider our decision in *Lemon* v. *Kurtzman, supra.* The government involvement with religious activity in this case is pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school. Conducting this formal religious observance conflicts with settled rules pertaining to prayer exercises for students, and that suffices to determine the question before us.

The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which "establishes a [state] religion or religious faith, or tends to do so." *Lynch, supra,* at 678; see also *County of Allegheny, supra,* at 591, quoting *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 15–16 (1947). The State's involvement in the school prayers challenged today violates these central principles.

That involvement is as troubling as it is undenied. A school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur. The principal chose the religious participant, here a rabbi, and that choice is also attributable to the State. The reason for the choice of a rabbi is not disclosed by the record, but the potential for divisiveness over the choice of a particular member of the clergy to conduct the ceremony is apparent.

Divisiveness, of course, can attend any state decision respecting religions, and neither its existence nor its potential

necessarily invalidates the State's attempts to accommodate religion in all cases. The potential for divisiveness is of particular relevance here though, because it centers around an overt religious exercise in a secondary school environment where, as we discuss below, see *infra*, at 593–594, subtle coercive pressures exist and where the student had no real alternative which would have allowed her to avoid the fact or appearance of participation.

The State's role did not end with the decision to include a prayer and with the choice of a clergyman. Principal Lee provided Rabbi Gutterman with a copy of the "Guidelines for Civic Occasions," and advised him that his prayers should be nonsectarian. Through these means the principal directed and controlled the content of the prayers. Even if the only sanction for ignoring the instructions were that the rabbi would not be invited back, we think no religious representative who valued his or her continued reputation and effectiveness in the community would incur the State's displeasure in this regard. It is a cornerstone principle of our Establishment Clause jurisprudence that "it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government," *Engel* v. *Vitale*, 370 U. S. 421, 425 (1962), and that is what the school officials attempted to do.

Petitioners argue, and we find nothing in the case to refute it, that the directions for the content of the prayers were a good-faith attempt by the school to ensure that the sectarianism which is so often the flashpoint for religious animosity be removed from the graduation ceremony. The concern is understandable, as a prayer which uses ideas or images identified with a particular religion may foster a different sort of sectarian rivalry than an invocation or benediction in terms more neutral. The school's explanation, however, does not resolve the dilemma caused by its participation. The question is not the good faith of the school in attempting to make

the prayer acceptable to most persons, but the legitimacy of its undertaking that enterprise at all when the object is to produce a prayer to be used in a formal religious exercise which students, for all practical purposes, are obliged to attend.

We are asked to recognize the existence of a practice of nonsectarian prayer, prayer within the embrace of what is known as the Judeo-Christian tradition, prayer which is more acceptable than one which, for example, makes explicit references to the God of Israel, or to Jesus Christ, or to a patron saint. There may be some support, as an empirical observation, to the statement of the Court of Appeals for the Sixth Circuit, picked up by Judge Campbell's dissent in the Court of Appeals in this case, that there has emerged in this country a civic religion, one which is tolerated when sectarian exercises are not. *Stein*, 822 F. 2d, at 1409; 908 F. 2d 1090, 1098–1099 (CA1 1990) (Campbell, J., dissenting) (case below); see also Note, Civil Religion and the Establishment Clause, 95 Yale L. J. 1237 (1986). If common ground can be defined which permits once conflicting faiths to express the shared conviction that there is an ethic and a morality which transcend human invention, the sense of community and purpose sought by all decent societies might be advanced. But though the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself.

The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, these same Clauses exist to protect religion from government in-

terference. James Madison, the principal author of the Bill of Rights, did not rest his opposition to a religious establishment on the sole ground of its effect on the minority. A principal ground for his view was: "[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." Memorial and Remonstrance Against Religious Assessments (1785), in 8 Papers of James Madison 301 (W. Rachal, R. Rutland, B. Ripel, & F. Teute eds. 1973).

These concerns have particular application in the case of school officials, whose effort to monitor prayer will be perceived by the students as inducing a participation they might otherwise reject. Though the efforts of the school officials in this case to find common ground appear to have been a good-faith attempt to recognize the common aspects of religions and not the divisive ones, our precedents do not permit school officials to assist in composing prayers as an incident to a formal exercise for their students. *Engel* v. *Vitale*, *supra*, at 425. And these same precedents caution us to measure the idea of a civic religion against the central meaning of the Religion Clauses of the First Amendment, which is that all creeds must be tolerated and none favored. The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted.

The degree of school involvement here made it clear that the graduation prayers bore the imprint of the State and thus put school-age children who objected in an untenable position. We turn our attention now to consider the position of the students, both those who desired the prayer and she who did not.

To endure the speech of false ideas or offensive content and then to counter it is part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry. And toler-

ance presupposes some mutuality of obligation. It is argued that our constitutional vision of a free society requires confidence in our own ability to accept or reject ideas of which we do not approve, and that prayer at a high school graduation does nothing more than offer a choice. By the time they are seniors, high school students no doubt have been required to attend classes and assemblies and to complete assignments exposing them to ideas they find distasteful or immoral or absurd or all of these. Against this background, students may consider it an odd measure of justice to be subjected during the course of their educations to ideas deemed offensive and irreligious, but to be denied a brief, formal prayer ceremony that the school offers in return. This argument cannot prevail, however. It overlooks a fundamental dynamic of the Constitution.

The First Amendment protects speech and religion by quite different mechanisms. Speech is protected by ensuring its full expression even when the government participates, for the very object of some of our most important speech is to persuade the government to adopt an idea as its own. *Meese* v. *Keene*, 481 U. S. 465, 480–481 (1987); see also *Keller* v. *State Bar of California*, 496 U. S. 1, 10–11 (1990); *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977). The method for protecting freedom of worship and freedom of conscience in religious matters is quite the reverse. In religious debate or expression the government is not a prime participant, for the Framers deemed religious establishment antithetical to the freedom of all. The Free Exercise Clause embraces a freedom of conscience and worship that has close parallels in the speech provisions of the First Amendment, but the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions. *Buckley* v. *Valeo*, 424 U. S. 1, 92–93, and n. 127 (1976) *(per curiam)*. The explanation lies in the lesson of history that was and is the inspiration for the Establishment Clause, the lesson that in

the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce. A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.

The lessons of the First Amendment are as urgent in the modern world as in the 18th century when it was written. One timeless lesson is that if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people. To compromise that principle today would be to deny our own tradition and forfeit our standing to urge others to secure the protections of that tradition for themselves.

As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools. See, *e. g., School Dist. of Abington* v. *Schempp*, 374 U. S. 203, 307 (1963) (Goldberg, J., concurring); *Edwards* v. *Aguillard*, 482 U. S. 578, 584 (1987); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 261–262 (1990) (KENNEDY, J., concurring). Our decisions in *Engel* v. *Vitale*, 370 U. S. 421 (1962), and *School Dist. of Abington, supra*, recognize, among other things, that prayer exercises in public schools carry a particular risk of indirect coercion. The concern may not be limited to the context of schools, but it is most pronounced there. See *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S., at 661 (KENNEDY, J., concurring in judgment in part and dissenting in part). What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

We need not look beyond the circumstances of this case to see the phenomenon at work. The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction. This pressure, though subtle and indirect, can be as real as any overt compulsion. Of course, in our culture standing or remaining silent can signify adherence to a view or simple respect for the views of others. And no doubt some persons who have no desire to join a prayer have little objection to standing as a sign of respect for those who do. But for the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, the injury is no less real. There can be no doubt that for many, if not most, of the students at the graduation, the act of standing or remaining silent was an expression of participation in the rabbi's prayer. That was the very point of the religious exercise. It is of little comfort to a dissenter, then, to be told that for her the act of standing or remaining in silence signifies mere respect, rather than participation. What matters is that, given our social conventions, a reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it.

Finding no violation under these circumstances would place objectors in the dilemma of participating, with all that implies, or protesting. We do not address whether that choice is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position. Research in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention. Brittain, Adolescent Choices and Parent-Peer Cross-Pressures,

28 Am. Sociological Rev. 385 (June 1963); Clasen & Brown, The Multidimensionality of Peer Pressure in Adolescence, 14 J. of Youth and Adolescence 451 (Dec. 1985); Brown, Clasen, & Eicher, Perceptions of Peer Pressure, Peer Conformity Dispositions, and Self-Reported Behavior Among Adolescents, 22 Developmental Psychology 521 (July 1986). To recognize that the choice imposed by the State constitutes an unacceptable constraint only acknowledges that the government may no more use social pressure to enforce orthodoxy than it may use more direct means.

The injury caused by the government's action, and the reason why Daniel and Deborah Weisman object to it, is that the State, in a school setting, in effect required participation in a religious exercise. It is, we concede, a brief exercise during which the individual can concentrate on joining its message, meditate on her own religion, or let her mind wander. But the embarrassment and the intrusion of the religious exercise cannot be refuted by arguing that these prayers, and similar ones to be said in the future, are of a *de minimis* character. To do so would be an affront to the rabbi who offered them and to all those for whom the prayers were an essential and profound recognition of divine authority. And for the same reason, we think that the intrusion is greater than the two minutes or so of time consumed for prayers like these. Assuming, as we must, that the prayers were offensive to the student and the parent who now object, the intrusion was both real and, in the context of a secondary school, a violation of the objectors' rights. That the intrusion was in the course of promulgating religion that sought to be civic or nonsectarian rather than pertaining to one sect does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront. See *supra*, at 593.

There was a stipulation in the District Court that attendance at graduation and promotional ceremonies is voluntary. Agreed Statement of Facts ¶ 41, App. 18. Petitioners and

the United States, as *amicus*, made this a center point of the case, arguing that the option of not attending the graduation excuses any inducement or coercion in the ceremony itself. The argument lacks all persuasion. Law reaches past formalism. And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme. True, Deborah could elect not to attend commencement without renouncing her diploma; but we shall not allow the case to turn on this point. Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions. A school rule which excuses attendance is beside the point. Attendance may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term "voluntary," for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years. Graduation is a time for family and those closest to the student to celebrate success and express mutual wishes of gratitude and respect, all to the end of impressing upon the young person the role that it is his or her right and duty to assume in the community and all of its diverse parts.

The importance of the event is the point the school district and the United States rely upon to argue that a formal prayer ought to be permitted, but it becomes one of the principal reasons why their argument must fail. Their contention, one of considerable force were it not for the constitutional constraints applied to state action, is that the prayers are an essential part of these ceremonies because for many persons an occasion of this significance lacks meaning if there is no recognition, however brief, that human achievements cannot be understood apart from their spiritual essence. We think the Government's position that this interest suffices to force students to choose between compliance or forfeiture demonstrates fundamental inconsistency in its argumentation. It fails to acknowledge that what for many of

Deborah's classmates and their parents was a spiritual imperative was for Daniel and Deborah Weisman religious conformance compelled by the State. While in some societies the wishes of the majority might prevail, the Establishment Clause of the First Amendment is addressed to this contingency and rejects the balance urged upon us. The Constitution forbids the State to exact religious conformity from a student as the price of attending her own high school graduation. This is the calculus the Constitution commands.

The Government's argument gives insufficient recognition to the real conflict of conscience faced by the young student. The essence of the Government's position is that with regard to a civic, social occasion of this importance it is the objector, not the majority, who must take unilateral and private action to avoid compromising religious scruples, hereby electing to miss the graduation exercise. This turns conventional First Amendment analysis on its head. It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice. To say that a student must remain apart from the ceremony at the opening invocation and closing benediction is to risk compelling conformity in an environment analogous to the classroom setting, where we have said the risk of compulsion is especially high. See *supra*, at 593-594. Just as in *Engel v. Vitale*, 370 U. S., at 430, and *School Dist. of Abington v. Schempp*, 374 U. S., at 224-225, where we found that provisions within the challenged legislation permitting a student to be voluntarily excused from attendance or participation in the daily prayers did not shield those practices from invalidation, the fact that attendance at the graduation ceremonies is voluntary in a legal sense does not save the religious exercise.

Inherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh v. Chambers*, 463 U. S. 783 (1983). The considera-

tions we have raised in objection to the invocation and benediction are in many respects similar to the arguments we considered in *Marsh*. But there are also obvious differences. The atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend. The influence and force of a formal exercise in a school graduation are far greater than the prayer exercise we condoned in *Marsh*. The *Marsh* majority in fact gave specific recognition to this distinction and placed particular reliance on it in upholding the prayers at issue there. 463 U. S., at 792. Today's case is different. At a high school graduation, teachers and principals must and do retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students. *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675 (1986). In this atmosphere the state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise in which the student was left with no alternative but to submit. This is different from *Marsh* and suffices to make the religious exercise a First Amendment violation. Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one, and we cannot accept the parallel relied upon by petitioners and the United States between the facts of *Marsh* and the case now before us. Our decisions in *Engel* v. *Vitale, supra,* and *School Dist. of Abington* v. *Schempp, supra,* require us to distinguish the public school context.

We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation. We know too that sometimes to endure

social isolation or even anger may be the price of conscience or nonconformity. But, by any reading of our cases, the conformity required of the student in this case was too high an exaction to withstand the test of the Establishment Clause. The prayer exercises in this case are especially improper because the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid.

Our jurisprudence in this area is of necessity one of line-drawing, of determining at what point a dissenter's rights of religious freedom are infringed by the State.

> "The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *School Dist. of Abington* v. *Schempp, supra,* at 308 (Goldberg, J., concurring).

Our society would be less than true to its heritage if it lacked abiding concern for the values of its young people, and we acknowledge the profound belief of adherents to many faiths that there must be a place in the student's life for precepts of a morality higher even than the law we today enforce. We express no hostility to those aspirations, nor would our oath permit us to do so. A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution. See *School Dist. of Abington, supra,* at 306 (Goldberg, J., concurring). We recognize that, at graduation time and throughout the course of the educational process, there will

be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students. See *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990). But these matters, often questions of accommodation of religion, are not before us. The sole question presented is whether a religious exercise may be conducted at a graduation ceremony in circumstances where, as we have found, young graduates who object are induced to conform. No holding by this Court suggests that a school can persuade or compel a student to participate in a religious exercise. That is being done here, and it is forbidden by the Establishment Clause of the First Amendment.

For the reasons we have stated, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, concurring.

Nearly half a century of review and refinement of Establishment Clause jurisprudence has distilled one clear understanding: Government may neither promote nor affiliate itself with any religious doctrine or organization, nor may it obtrude itself in the internal affairs of any religious institution. The application of these principles to the present case mandates the decision reached today by the Court.

I

This Court first reviewed a challenge to state law under the Establishment Clause in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947).[1] Relying on the history of the

---

[1] A few earlier cases involving federal laws touched on interpretation of the Establishment Clause. In *Reynolds* v. *United States*, 98 U. S. 145 (1879), and *Davis* v. *Beason*, 133 U. S. 333 (1890), the Court considered the Clause in the context of federal laws prohibiting bigamy. The Court in *Reynolds* accepted Thomas Jefferson's letter to the Danbury Baptist Asso-

Clause, and the Court's prior analysis, Justice Black outlined the considerations that have become the touchstone of Establishment Clause jurisprudence: Neither a State nor the Federal Government can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither a State nor the Federal Government, openly or secretly, can participate in the affairs of any religious organization and vice versa.[2] "In the words of Jefferson, the clause

---

ciation "almost as an authoritative declaration of the scope and effect" of the First Amendment. 98 U. S., at 164. In that letter Jefferson penned his famous lines that the Establishment Clause built "a wall of separation between church and State." *Ibid.* *Davis* considered that "[t]he first amendment to the Constitution ... was intended ... to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect." 133 U. S., at 342. In another case, *Bradfield* v. *Roberts,* 175 U. S. 291 (1899), the Court held that it did not violate the Establishment Clause for Congress to construct a hospital building for caring for poor patients, although the hospital was managed by sisters of the Roman Catholic Church. The Court reasoned: "That the influence of any particular church may be powerful over the members of a non-sectarian and secular corporation, incorporated for a certain defined purpose and with clearly stated powers, is surely not sufficient to convert such a corporation into a religious or sectarian body." *Id.,* at 298. Finally, in 1908 the Court held that "the spirit of the Constitution" did not prohibit the Indians from using their money, held by the United States Government, for religious education. See *Quick Bear* v. *Leupp,* 210 U. S. 50, 81.

[2]The Court articulated six examples of paradigmatic practices that the Establishment Clause prohibits: "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious

against establishment of religion by law was intended to erect 'a wall of separation between church and State.'" *Everson,* 330 U. S., at 16 (quoting *Reynolds* v. *United States,* 98 U. S. 145, 164 (1879)). The dissenters agreed: "The Amendment's purpose . . . was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion." 330 U. S., at 31–32 (Rutledge, J., dissenting, joined by Frankfurter, Jackson, and Burton, JJ.).

In *Engel* v. *Vitale,* 370 U. S. 421 (1962), the Court considered for the first time the constitutionality of prayer in a public school. Students said aloud a short prayer selected by the State Board of Regents: "'Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country.'" *Id.,* at 422. Justice Black, writing for the Court, again made clear that the First Amendment forbids the use of the power or prestige of the government to control, support, or influence the religious beliefs and practices of the American people. Although the prayer was "denominationally neutral" and "its observance on the part of the students [was] voluntary," *id.,* at 430, the Court found that it violated this essential precept of the Establishment Clause.

A year later, the Court again invalidated government-sponsored prayer in public schools in *School Dist. of Abington* v. *Schempp,* 374 U. S. 203 (1963). In *Schempp,* the school day for Baltimore, Maryland, and Abington Township, Pennsylvania, students began with a reading from the Bible, or a recitation of the Lord's Prayer, or both. After a thorough review of the Court's prior Establishment Clause cases, the Court concluded:

organizations or groups and *vice versa.*" *Everson* v. *Board of Ed. of Ewing,* 330 U. S., at 15.

"[T]he Establishment Clause has been directly considered by this Court eight times in the past score of years and, with only one Justice dissenting on the point, it has consistently held that the clause withdrew all legislative power respecting religious belief or the expression thereof. The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion, then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." *Id.*, at 222.

Because the schools' opening exercises were government-sponsored religious ceremonies, the Court found that the primary effect was the advancement of religion and held, therefore, that the activity violated the Establishment Clause. *Id.*, at 223–224.

Five years later, the next time the Court considered whether religious activity in public schools violated the Establishment Clause, it reiterated the principle that government "may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite." *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). "'If [the purpose or primary effect] is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution.'" *Id.*, at 107 (quoting *Schempp*, 374 U. S., at 222). Finding that the Arkansas law aided religion by preventing the teaching of evolution, the Court invalidated it.

In 1971, Chief Justice Burger reviewed the Court's past decisions and found: "Three . . . tests may be gleaned from our cases." *Lemon* v. *Kurtzman*, 403 U. S. 602, 612. In order for a statute to survive an Establishment Clause challenge, "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally the statute must not foster an excessive government entanglement with

religion." *Id.*, at 612–613 (internal quotation marks and citations omitted).[3] After *Lemon*, the Court continued to rely on these basic principles in resolving Establishment Clause disputes.[4]

Application of these principles to the facts of this case is straightforward. There can be "no doubt" that the "invocation of God's blessings" delivered at Nathan Bishop Middle School "is a religious activity." *Engel*, 370 U. S., at 424. In the words of *Engel*, the rabbi's prayer "is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious." *Id.*, at 424–425. The question then is whether the government has "plac[ed] its official stamp of approval" on the prayer. *Id.*, at 429. As the Court ably demonstrates, when the government "compose[s] official prayers," *id.*, at 425, selects the member of the clergy to deliver the prayer, has the prayer delivered at a public school event that is planned, supervised, and given by school officials, and pres-

---

[3] The final prong, excessive entanglement, was a focus of *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 674 (1970), but harkens back to the final example in *Everson:* "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.*" *Everson*, 330 U. S., at 16. The discussion in *Everson* reflected the Madisonian concern that secular and religious authorities must not interfere with each other's respective spheres of choice and influence. See generally The Complete Madison 298–312 (S. Padover ed. 1953).

[4] Since 1971, the Court has decided 31 Establishment Clause cases. In only one instance, the decision of *Marsh* v. *Chambers*, 463 U. S. 783 (1983), has the Court not rested its decision on the basic principles described in *Lemon*. For example, in the most recent Establishment Clause case, *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990), the Court applied the three-part *Lemon* analysis to the Equal Access Act, which made it unlawful for public secondary schools to deny equal access to any student wishing to hold religious meetings. *Id.*, at 248–253 (plurality opinion); *id.*, at 262 (Marshall, J., concurring in judgment). In no case involving religious activities in public schools has the Court failed to apply vigorously the *Lemon* factors.

sures students to attend and participate in the prayer, there can be no doubt that the government is advancing and promoting religion.[5] As our prior decisions teach us, it is this that the Constitution prohibits.

## II

I join the Court's opinion today because I find nothing in it inconsistent with the essential precepts of the Establishment Clause developed in our precedents. The Court holds that the graduation prayer is unconstitutional because the State "in effect required participation in a religious exercise." *Ante*, at 594. Although our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient. Government pressure to participate in a religious activity is an obvious indication that the government is endorsing or promoting religion.

But it is not enough that the government restrain from compelling religious practices: It must not engage in them either. See *Schempp*, 374 U. S., at 305 (Goldberg, J., concurring). The Court repeatedly has recognized that a violation of the Establishment Clause is not predicated on coercion. See, *e. g., id.*, at 223; *id.*, at 229 (Douglas, J., concurring); *Wallace* v. *Jaffree*, 472 U. S. 38, 72 (1985) (O'CONNOR, J., concurring in judgment) ("The decisions [in *Engel* and *Schempp*] acknowledged the coercion implicit under the statutory schemes, but they expressly turned only on the fact that the government was sponsoring a manifestly religious exercise" (citation omitted)); *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 786 (1973) ("[P]roof of coercion . . . [is] not a necessary element of any claim under the Establishment Clause"). The Establishment Clause proscribes public schools from "conveying or attempting to con-

---

[5] In this case, the religious message it promotes is specifically Judeo-Christian. The phrase in the benediction: "We must each strive to fulfill what you require of us all, to do justly, to love mercy, to walk humbly" obviously was taken from the Book of the Prophet Micah, ch. 6, v. 8.

vey a message that religion or a particular religious belief is *favored* or *preferred*," *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 593 (1989) (internal quotation marks omitted; emphasis in original), even if the schools do not actually "impos[e] pressure upon a student to participate in a religious activity."[6] *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 261 (1990) (KENNEDY, J., concurring in part and concurring in judgment).

The scope of the Establishment Clause's prohibitions developed in our case law derives from the Clause's purposes. The First Amendment encompasses two distinct guarantees—the government shall make no law respecting an establishment of religion or prohibiting the free exercise thereof—both with the common purpose of securing religious liberty.[7] Through vigorous enforcement of both Clauses, we "promote and assure the fullest possible scope of religious liberty and tolerance for all and . . . nurture the conditions which secure the best hope of attainment of that end." *Schempp*, 374 U. S., at 305 (Goldberg, J., concurring).

There is no doubt that attempts to aid religion through government coercion jeopardize freedom of conscience. Even subtle pressure diminishes the right of each individual to choose voluntarily what to believe. Representative Carroll explained during congressional debate over the Estab-

---

[6] As a practical matter, of course, anytime the government endorses a religious belief there will almost always be some pressure to conform. "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962).

[7] See, *e. g., Everson*, 330 U. S., at 40 (Rutledge, J., dissenting) ("'Establishment' and 'free exercise' were correlative and coextensive ideas, representing only different facets of the single great and fundamental freedom"); *School Dist. of Abington* v. *Schempp*, 374 U. S. 203, 227 (1963) (Douglas, J., concurring); *id.*, at 305 (Goldberg, J., concurring); *Wallace* v. *Jaffree*, 472 U. S. 38, 50 (1985).

lishment Clause: "[T]hė rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand." 1 Annals of Cong. 757 (1789).

Our decisions have gone beyond prohibiting coercion, however, because the Court has recognized that "the fullest possible scope of religious liberty," *Schempp*, 374 U. S., at 305 (Goldberg, J., concurring), entails more than freedom from coercion. The Establishment Clause protects religious liberty on a grand scale; it is a social compact that guarantees for generations a democracy and a strong religious community—both essential to safeguarding religious liberty. "Our fathers seem to have been perfectly sincere in their belief that the members of the Church would be more patriotic, and the citizens of the State more religious, by keeping their respective functions entirely separate." Religious Liberty, in Essays and Speeches of Jeremiah S. Black 53 (C. Black ed. 1885) (Chief Justice of the Commonwealth of Pennsylvania).[8]

The mixing of government and religion can be a threat to free government, even if no one is forced to participate. When the government puts its *imprimatur* on a particular religion, it conveys a message of exclusion to all those who do not adhere to the favored beliefs.[9] A government cannot

---

[8] See also *Engel*, 370 U. S., at 431 (The Clause's "first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion"); *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign Cty.*, 333 U. S. 203, 212 (1948) ("[T]he First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere").

[9] "[T]he Establishment Clause is infringed when the government makes adherence to religion relevant to a person's standing in the political community. Direct government action endorsing religion or a particular religious practice is invalid under this approach because it sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Wallace* v. *Jaffree*, 472 U. S., at 69 (O'CONNOR, J., concurring in judgment) (internal quotation marks omitted).

be premised on the belief that all persons are created equal when it asserts that God prefers some. Only "[a]nguish, hardship and bitter strife" result "when zealous religious groups struggl[e] with one another to obtain the Government's stamp of approval." *Engel*, 370 U. S., at 429; see also *Lemon*, 403 U. S., at 622–623; *Aguilar* v. *Felton*, 473 U. S. 402, 416 (1985) (Powell, J., concurring).[10] Such a struggle can "strain a political system to the breaking point." *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 694 (1970) (opinion of Harlan, J.).

When the government arrogates to itself a role in religious affairs, it abandons its obligation as guarantor of democracy. Democracy requires the nourishment of dialog and dissent, while religious faith puts its trust in an ultimate divine authority above all human deliberation. When the government appropriates religious truth, it "transforms rational debate into theological decree." Nuechterlein, Note, The Free Exercise Boundaries of Permissible Accommodation Under the Establishment Clause, 99 Yale L. J. 1127, 1131 (1990). Those who disagree no longer are questioning the policy judgment of the elected but the rules of a higher authority who is beyond reproach.

---

[10] Sigmund Freud expressed it this way: "a religion, even if it calls itself the religion of love, must be hard and unloving to those who do not belong to it." S. Freud, Group Psychology and the Analysis of the Ego 51 (1922). James Madison stated the theory even more strongly in his "Memorial and Remonstrance" against a bill providing tax funds to religious teachers: "It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority. Distant as it may be, in its present form, from the Inquisition it differs from it only in degree. The one is the first step, the other the last in the career of intolerance." The Complete Madison, at 303. Religion has not lost its power to engender divisiveness. "Of all the issues the ACLU takes on—reproductive rights, discrimination, jail and prison conditions, abuse of kids in the public schools, police brutality, to name a few—by far the most volatile issue is that of school prayer. Aside from our efforts to abolish the death penalty, it is the only issue that elicits death threats." Parish, Graduation Prayer Violates the Bill of Rights, 4 Utah Bar J. 19 (June/July 1991).

Madison warned that government officials who would use religious authority to pursue secular ends "exceed the commission from which they derive their authority and are Tyrants. The People who submit to it are governed by laws made neither by themselves, nor by an authority derived from them, and are slaves." Memorial and Remonstrance against Religious Assessments (1785), in The Complete Madison 300 (S. Padover ed. 1953). Democratic government will not last long when proclamation replaces persuasion as the medium of political exchange.

Likewise, we have recognized that "[r]eligion flourishes in greater purity, without than with the aid of Gov[ernment]."[11] Id., at 309. To "make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary," Zorach v. Clauson, 343 U. S. 306, 313 (1952), the government must not align itself with any one of them. When the government favors a particular religion or sect, the disadvantage to all others is obvious, but even the favored religion may fear being "taint[ed] . . . with a corrosive secularism." School Dist. of Grand Rapids v. Ball, 473 U. S. 373, 385 (1985). The favored religion may be compromised as political figures reshape the religion's beliefs for their own purposes; it may be reformed as government largesse brings government regulation.[12] Keeping religion in the hands of private groups minimizes state intrusion on religious choice and best enables each religion to "flourish according to the

---

[11] The view that the Establishment Clause was primarily a vehicle for protecting churches was expounded initially by Roger Williams. "[W]ordly corruptions . . . might consume the churches if sturdy fences against the wilderness were not maintained." M. Howe, The Garden and the Wilderness 6 (1965).

[12] "[B]ut when a religion contracts an alliance of this nature, I do not hesitate to affirm that it commits the same error as a man who should sacrifice his future to his present welfare; and in obtaining a power to which it has no claim, it risks that authority which is rightfully its own." 1 A. de Tocqueville, Democracy in America 315 (H. Reeve transl. 1900).

zeal of its adherents and the appeal of its dogma." *Zorach,* 343 U. S., at 313.

It is these understandings and fears that underlie our Establishment Clause jurisprudence. We have believed that religious freedom cannot exist in the absence of a free democratic government, and that such a government cannot endure when there is fusion between religion and the political regime. We have believed that religious freedom cannot thrive in the absence of a vibrant religious community and that such a community cannot prosper when it is bound to the secular. And we have believed that these were the animating principles behind the adoption of the Establishment Clause. To that end, our cases have prohibited government endorsement of religion, its sponsorship, and active involvement in religion, whether or not citizens were coerced to conform.

I remain convinced that our jurisprudence is not misguided, and that it requires the decision reached by the Court today. Accordingly, I join the Court in affirming the judgment of the Court of Appeals.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, concurring.

I join the whole of the Court's opinion, and fully agree that prayers at public school graduation ceremonies indirectly coerce religious observance. I write separately nonetheless on two issues of Establishment Clause analysis that underlie my independent resolution of this case: whether the Clause applies to governmental practices that do not favor one religion or denomination over others, and whether state coercion of religious conformity, over and above state endorsement of religious exercise or belief, is a necessary element of an Establishment Clause violation.

I

Forty-five years ago, this Court announced a basic principle of constitutional law from which it has not strayed: the

Establishment Clause forbids not only state practices that "aid one religion . . . or prefer one religion over another," but also those that "aid all religions." *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 15 (1947). Today we reaffirm that principle, holding that the Establishment Clause forbids state-sponsored prayers in public school settings no matter how nondenominational the prayers may be. In barring the State from sponsoring generically theistic prayers where it could not sponsor sectarian ones, we hold true to a line of precedent from which there is no adequate historical case to depart.

## A

Since *Everson*, we have consistently held the Clause applicable no less to governmental acts favoring religion generally than to acts favoring one religion over others.[1] Thus, in *Engel* v. *Vitale*, 370 U. S. 421 (1962), we held that the public schools may not subject their students to readings of any prayer, however "denominationally neutral." *Id.*, at 430. More recently, in *Wallace* v. *Jaffree*, 472 U. S. 38 (1985), we held that an Alabama moment-of-silence statute passed for the sole purpose of "returning voluntary prayer to public schools," *id.*, at 57, violated the Establishment Clause even though it did not encourage students to pray to any particular deity. We said that "when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." *Id.*, at 52–53. This conclusion, we held,

> "derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful,

---

[1] Cf. *Larson* v. *Valente*, 456 U. S. 228 (1982) (subjecting discrimination against certain religious organizations to test of strict scrutiny).

and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among 'religions'—to encompass intolerance of the disbeliever and the uncertain." *Id.,* at 53–54 (footnotes omitted).

Likewise, in *Texas Monthly, Inc.* v. *Bullock,* 489 U.S. 1 (1989), we struck down a state tax exemption benefiting only religious periodicals; even though the statute in question worked no discrimination among sects, a majority of the Court found that its preference for religious publications over all other kinds "effectively endorses religious belief." *Id.,* at 17 (plurality opinion); see *id.,* at 28 (BLACKMUN, J., concurring in judgment) ("A statutory preference for the dissemination of religious ideas offends our most basic understanding of what the Establishment Clause is all about and hence is constitutionally intolerable"). And in *Torcaso* v. *Watkins,* 367 U.S. 488 (1961), we struck down a provision of the Maryland Constitution requiring public officials to declare a "'belief in the existence of God,'" *id.,* at 489, reasoning that, under the Religion Clauses of the First Amendment, "neither a State nor the Federal Government ... can constitutionally pass laws or impose requirements which aid all religions as against non-believers ...," *id.,* at 495. See also *Epperson* v. *Arkansas,* 393 U.S. 97, 104 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion"); *School Dist. of Abington* v. *Schempp,* 374 U.S. 203, 216 (1963) ("this Court has rejected unequivocally the contention that the Establishment Clause forbids only governmental preference of one religion over another"); *id.,* at 319–320 (Stewart, J., dissenting) (the Clause applies "to each of us, be he Jew or Agnostic, Christian or Atheist, Buddhist or Freethinker").

Such is the settled law. Here, as elsewhere, we should stick to it absent some compelling reason to discard it. See

*Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984); *Payne* v. *Tennessee,* 501 U. S. 808, 842 (1991) (SOUTER, J., concurring).

## B

Some have challenged this precedent by reading the Establishment Clause to permit "nonpreferential" state promotion of religion. The challengers argue that, as originally understood by the Framers, "[t]he Establishment Clause did not require government neutrality between religion and irreligion nor did it prohibit the Federal Government from providing nondiscriminatory aid to religion." *Wallace, supra,* at 106 (REHNQUIST, J., dissenting); see also R. Cord, Separation of Church and State: Historical Fact and Current Fiction (1988). While a case has been made for this position, it is not so convincing as to warrant reconsideration of our settled law; indeed, I find in the history of the Clause's textual development a more powerful argument supporting the Court's jurisprudence following *Everson.*

When James Madison arrived at the First Congress with a series of proposals to amend the National Constitution, one of the provisions read that "[t]he civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." 1 Annals of Cong. 434 (1789). Madison's language did not last long. It was sent to a Select Committee of the House, which, without explanation, changed it to read that "no religion shall be established by law, nor shall the equal rights of conscience be infringed." *Id.,* at 729. Thence the proposal went to the Committee of the Whole, which was in turn dissatisfied with the Select Committee's language and adopted an alternative proposed by Samuel Livermore of New Hampshire: "Congress shall make no laws touching religion, or infringing the rights of conscience." See *id.,* at 731. Livermore's proposal would have forbidden laws having anything to do with religion and was thus not

only far broader than Madison's version, but broader even than the scope of the Establishment Clause as we now understand it. See, *e. g.*, *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327 (1987) (upholding legislative exemption of religious groups from certain obligations under civil rights laws).

The House rewrote the amendment once more before sending it to the Senate, this time adopting, without recorded debate, language derived from a proposal by Fisher Ames of Massachusetts: "Congress shall make no law establishing Religion, or prohibiting the free exercise thereof, nor shall the rights of conscience be infringed." 1 Documentary History of the First Federal Congress of the United States of America 136 (Senate Journal) (L. de Pauw ed. 1972); see 1 Annals of Cong. 765 (1789). Perhaps, on further reflection, the Representatives had thought Livermore's proposal too expansive, or perhaps, as one historian has suggested, they had simply worried that his language would not "satisfy the demands of those who wanted something said specifically against establishments of religion." L. Levy, The Establishment Clause 81 (1986) (hereinafter Levy). We do not know; what we do know is that the House rejected the Select Committee's version, which arguably ensured only that "no religion" enjoyed an official preference over others, and deliberately chose instead a prohibition extending to laws establishing "religion" in general.

The sequence of the Senate's treatment of this House proposal, and the House's response to the Senate, confirm that the Framers meant the Establishment Clause's prohibition to encompass nonpreferential aid to religion. In September 1789, the Senate considered a number of provisions that would have permitted such aid, and ultimately it adopted one of them. First, it briefly entertained this language: "Congress shall make no law establishing One Religious Sect or Society in preference to others, nor shall the rights of conscience be infringed." See 1 Documentary History, at 151

(Senate Journal); *id.*, at 136. After rejecting two minor amendments to that proposal, see *id.*, at 151, the Senate dropped it altogether and chose a provision identical to the House's proposal, but without the clause protecting the "rights of conscience," *ibid.* With no record of the Senate debates, we cannot know what prompted these changes, but the record does tell us that, six days later, the Senate went half circle and adopted its narrowest language yet: "Congress shall make no law establishing articles of faith or a mode of worship, or prohibiting the free exercise of religion." *Id.*, at 166. The Senate sent this proposal to the House along with its versions of the other constitutional amendments proposed.

Though it accepted much of the Senate's work on the Bill of Rights, the House rejected the Senate's version of the Establishment Clause and called for a joint conference committee, to which the Senate agreed. The House conferees ultimately won out, persuading the Senate to accept this as the final text of the Religion Clauses: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." What is remarkable is that, unlike the earliest House drafts or the final Senate proposal, the prevailing language is not limited to laws respecting an establishment of "a religion," "a national religion," "one religious sect," or specific "articles of faith."[2] The Framers re-

---

[2] Some commentators have suggested that by targeting laws respecting "an" establishment of religion, the Framers adopted the very nonpreferentialist position whose much clearer articulation they repeatedly rejected. See, *e. g.*, R. Cord, Separation of Church and State 11–12 (1988). Yet the indefinite article before the word "establishment" is better seen as evidence that the Clause forbids any kind of establishment, including a nonpreferential one. If the Framers had wished, for some reason, to use the indefinite term to achieve a narrow meaning for the Clause, they could far more aptly have placed it before the word "religion." See Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 884–885 (1986) (hereinafter Laycock, "Nonpreferential" Aid).

peatedly considered and deliberately rejected such narrow language and instead extended their prohibition to state support for "religion" in general.

Implicit in their choice is the distinction between preferential and nonpreferential establishments, which the weight of evidence suggests the Framers appreciated. See, *e. g.*, Laycock, "Nonpreferential" Aid 902–906; Levy 91–119. But cf. T. Curry, The First Freedoms 208–222 (1986). Of particular note, the Framers were vividly familiar with efforts in the Colonies and, later, the States to impose general, nondenominational assessments and other incidents of ostensibly ecumenical establishments. See generally Levy 1–62. The Virginia statute for religious freedom, written by Jefferson and sponsored by Madison, captured the separationist response to such measures. Condemning all establishments, however nonpreferentialist, the statute broadly guaranteed that "no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever," including his own. Act for Establishing Religious Freedom (1785), in 5 The Founders' Constitution 84, 85 (P. Kurland & R. Lerner eds. 1987). Forcing a citizen to support even his own church would, among other things, deny "the ministry those temporary rewards, which proceeding from an approbation of their personal conduct, are an additional incitement to earnest and unremitting labours for the instruction of mankind." *Id.*, at 84. In general, Madison later added, "religion & Govt. will both exist in greater purity, the less they are mixed together." Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 105, 106.

What we thus know of the Framers' experience underscores the observation of one prominent commentator, that confining the Establishment Clause to a prohibition on preferential aid "requires a premise that the Framers were extraordinarily bad drafters—that they believed one thing but adopted language that said something substantially different, and that they did so after repeatedly attending to the

choice of language." Laycock, "Nonpreferential" Aid 882–883; see also *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 647–648 (1989) (opinion of STEVENS, J.). We must presume, since there is no conclusive evidence to the contrary, that the Framers embraced the significance of their textual judgment.[3] Thus, on balance, history neither contradicts nor warrants reconsideration of the settled principle that the Establishment Clause forbids support for religion in general no less than support for one religion or some.

## C

While these considerations are, for me, sufficient to reject the nonpreferentialist position, one further concern animates my judgment. In many contexts, including this one, nonpreferentialism requires some distinction between "sectarian" religious practices and those that would be, by some measure, ecumenical enough to pass Establishment Clause muster. Simply by requiring the enquiry, nonpreferentialists invite the courts to engage in comparative theology. I can hardly imagine a subject less amenable to the compe-

---

[3] In his dissent in *Wallace* v. *Jaffree*, 472 U. S. 38 (1985), THE CHIEF JUSTICE rested his nonpreferentialist interpretation partly on the post-ratification actions of the early National Government. Aside from the willingness of some (but not all) early Presidents to issue ceremonial religious proclamations, which were at worst trivial breaches of the Establishment Clause, see *infra*, at 630–631, he cited such seemingly preferential aid as a treaty provision, signed by Jefferson, authorizing federal subsidization of a Roman Catholic priest and church for the Kaskaskia Indians. 472 U. S., at 103. But this proves too much, for if the Establishment Clause permits a special appropriation of tax money for the religious activities of a particular sect, it forbids virtually nothing. See Laycock, "Nonpreferential" Aid 915. Although evidence of historical practice can indeed furnish valuable aid in the interpretation of contemporary language, acts like the one in question prove only that public officials, no matter when they serve, can turn a blind eye to constitutional principle. See *infra*, at 626.

tence of the federal judiciary, or more deliberately to be avoided where possible.

This case is nicely in point. Since the nonpreferentiality of a prayer must be judged by its text, JUSTICE BLACKMUN pertinently observes, *ante*, at 604, n. 5, that Rabbi Gutterman drew his exhortation " '[t]o do justly, to love mercy, to walk humbly' " straight from the King James version of Micah, ch. 6, v. 8. At some undefinable point, the similarities between a state-sponsored prayer and the sacred text of a specific religion would so closely identify the former with the latter that even a nonpreferentialist would have to concede a breach of the Establishment Clause. And even if Micah's thought is sufficiently generic for most believers, it still embodies a straightforwardly theistic premise, and so does the rabbi's prayer. Many Americans who consider themselves religious are not theistic; some, like several of the Framers, are deists who would question Rabbi Gutterman's plea for divine advancement of the country's political and moral good. Thus, a nonpreferentialist who would condemn subjecting public school graduates to, say, the Anglican liturgy would still need to explain why the government's preference for theistic over nontheistic religion is constitutional.

Nor does it solve the problem to say that the State should promote a "diversity" of religious views; that position would necessarily compel the government and, inevitably, the courts to make wholly inappropriate judgments about the number of religions the State should sponsor and the relative frequency with which it should sponsor each. In fact, the prospect would be even worse than that. As Madison observed in criticizing religious Presidential proclamations, the practice of sponsoring religious messages tends, over time, "to narrow the recommendation to the standard of the predominant sect." Madison's "Detached Memoranda," 3 Wm. & Mary Q. 534, 561 (E. Fleet ed. 1946) (hereinafter Madison's "Detached Memoranda"). We have not changed much since the days of Madison, and the judiciary should not

willingly enter the political arena to battle the centripetal force leading from religious pluralism to official preference for the faith with the most votes.

## II

Petitioners rest most of their argument on a theory that, whether or not the Establishment Clause permits extensive nonsectarian support for religion, it does not forbid the state to sponsor affirmations of religious belief that coerce neither support for religion nor participation in religious observance. I appreciate the force of some of the arguments supporting a "coercion" analysis of the Clause. See generally *County of Allegheny, supra,* at 655–679 (opinion of KENNEDY, J.); McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L. Rev. 933 (1986). But we could not adopt that reading without abandoning our settled law, a course that, in my view, the text of the Clause would not readily permit. Nor does the extratextual evidence of original meaning stand so unequivocally at odds with the textual premise inherent in existing precedent that we should fundamentally reconsider our course.

## A

Over the years, this Court has declared the invalidity of many noncoercive state laws and practices conveying a message of religious endorsement. For example, in *County of Allegheny, supra,* we forbade the prominent display of a nativity scene on public property; without contesting the dissent's observation that the crèche coerced no one into accepting or supporting whatever message it proclaimed, five Members of the Court found its display unconstitutional as a state endorsement of Christianity. *Id.,* at 589–594, 598–602. Likewise, in *Wallace* v. *Jaffree,* 472 U. S. 38 (1985), we struck down a state law requiring a moment of silence in public classrooms not because the statute coerced students to participate in prayer (for it did not), but because the manner of

its enactment "convey[ed] a message of state approval of prayer activities in the public schools." *Id.*, at 61; see also *id.*, at 67–84 (O'CONNOR, J., concurring in judgment). Cf. *Engel* v. *Vitale*, 370 U. S., at 431 ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain. But the purposes underlying the Establishment Clause go much further than that").

In *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), we invalidated a state law that barred the teaching of Darwin's theory of evolution because, even though the statute obviously did not coerce anyone to support religion or participate in any religious practice, it was enacted for a singularly religious purpose. See also *Edwards* v. *Aguillard*, 482 U. S. 578, 593 (1987) (statute requiring instruction in "creation science" "endorses religion in violation of the First Amendment"). And in *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), we invalidated a program whereby the State sent public school teachers to parochial schools to instruct students on ostensibly nonreligious matters; while the scheme clearly did not coerce anyone to receive or subsidize religious instruction, we held it invalid because, among other things, "[t]he symbolic union of church and state inherent in the [program] threatens to convey a message of state support for religion to students and to the general public." *Id.*, at 397; see also *Texas Monthly, Inc.* v. *Bullock*, 489 U. S., at 17 (plurality opinion) (tax exemption benefiting only religious publications "effectively endorses religious belief"); *id.*, at 28 (BLACKMUN, J., concurring in judgment) (exemption unconstitutional because State "engaged in preferential support for the communication of religious messages").

Our precedents may not always have drawn perfectly straight lines. They simply cannot, however, support the position that a showing of coercion is necessary to a successful Establishment Clause claim.

## B

Like the provisions about "due" process and "unreasonable" searches and seizures, the constitutional language forbidding laws "respecting an establishment of religion" is not pellucid. But virtually everyone acknowledges that the Clause bans more than formal establishments of religion in the traditional sense, that is, massive state support for religion through, among other means, comprehensive schemes of taxation. See generally Levy 1–62 (discussing such establishments in the Colonies and early States). This much follows from the Framers' explicit rejection of simpler provisions prohibiting either the establishment of a religion or laws "establishing religion" in favor of the broader ban on laws "respecting an establishment of religion." See *supra,* at 612–614.

While some argue that the Framers added the word "respecting" simply to foreclose federal interference with state establishments of religion, see, *e. g.,* Amar, The Bill of Rights as a Constitution, 100 Yale L. J. 1131, 1157 (1991), the language sweeps more broadly than that. In Madison's words, the Clause in its final form forbids "everything like" a national religious establishment, see Madison's "Detached Memoranda" 558, and, after incorporation, it forbids "everything like" a state religious establishment.[4] Cf. *County of Allegheny,* 492 U. S., at 649 (opinion of STEVENS, J.). The sweep is broad enough that Madison himself characterized congressional provisions for legislative and military chaplains as unconstitutional "establishments." Madison's "Detached Memoranda" 558–559; see *infra,* at 624–625, and n. 6.

---

[4] In *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1 (1947), we unanimously incorporated the Establishment Clause into the Due Process Clause of the Fourteenth Amendment and, by so doing, extended its reach to the actions of States. *Id.,* at 14–15; see also *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940) (dictum). Since then, not one Member of this Court has proposed disincorporating the Clause.

While petitioners insist that the prohibition extends only to the "coercive" features and incidents of establishment, they cannot easily square that claim with the constitutional text. The First Amendment forbids not just laws "respecting an establishment of religion," but also those "prohibiting the free exercise thereof." Yet laws that coerce nonadherents to "support or participate in any religion or its exercise," *County of Allegheny, supra,* at 659–660 (opinion of KENNEDY, J.), would virtually by definition violate their right to religious free exercise. See *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 877 (1990) (under Free Exercise Clause, "government may not compel affirmation of religious belief"), citing *Torcaso* v. *Watkins,* 367 U. S. 488 (1961); see also J. Madison, Memorial and Remonstrance Against Religious Assessments (1785) (compelling support for religious establishments violates "free exercise of Religion"), quoted in 5 The Founders' Constitution, at 82, 84. Thus, a literal application of the coercion test would render the Establishment Clause a virtual nullity, as petitioners' counsel essentially conceded at oral argument. Tr. of Oral Arg. 18.

Our cases presuppose as much; as we said in *School Dist. of Abington,* "[t]he distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." 374 U. S., at 223; see also Laycock, "Nonpreferential" Aid 922 ("If coercion is . . . an element of the establishment clause, establishment adds nothing to free exercise"). While one may argue that the Framers meant the Establishment Clause simply to ornament the First Amendment, cf. T. Curry, The First Freedoms 216–217 (1986), that must be a reading of last resort. Without compelling evidence to the contrary, we should presume that the Framers meant the Clause to stand for something more than petitioners attribute to it.

## C

Petitioners argue from the political setting in which the Establishment Clause was framed, and from the Framers' own political practices following ratification, that government may constitutionally endorse religion so long as it does not coerce religious conformity. The setting and the practices warrant canvassing, but while they yield some evidence for petitioners' argument, they do not reveal the degree of consensus in early constitutional thought that would raise a threat to *stare decisis* by challenging the presumption that the Establishment Clause adds something to the Free Exercise Clause that follows it.

The Framers adopted the Religion Clauses in response to a long tradition of coercive state support for religion, particularly in the form of tax assessments, but their special antipathy to religious coercion did not exhaust their hostility to the features and incidents of establishment. Indeed, Jefferson and Madison opposed any political appropriation of religion, see *infra*, at 623–626, and, even when challenging the hated assessments, they did not always temper their rhetoric with distinctions between coercive and noncoercive state action. When, for example, Madison criticized Virginia's general assessment bill, he invoked principles antithetical to all state efforts to promote religion. An assessment, he wrote, is improper not simply because it forces people to donate "three pence" to religion, but, more broadly, because "it is itself a signal of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority." J. Madison, Memorial and Remonstrance Against Religious Assessments (1785), in 5 The Founders' Constitution, at 83. Madison saw that, even without the tax collector's participation, an official endorsement of religion can impair religious liberty.

Petitioners contend that because the early Presidents included religious messages in their inaugural and Thanksgiving Day addresses, the Framers could not have meant the

Establishment Clause to forbid noncoercive state endorsement of religion. The argument ignores the fact, however, that Americans today find such proclamations less controversial than did the founding generation, whose published thoughts on the matter belie petitioners' claim. President Jefferson, for example, steadfastly refused to issue Thanksgiving proclamations of any kind, in part because he thought they violated the Religion Clauses. Letter from Thomas Jefferson to Rev. S. Miller (Jan. 23, 1808), in 5 The Founders' Constitution, at 98. In explaining his views to the Reverend Samuel Miller, Jefferson effectively anticipated, and rejected, petitioners' position:

> "[I]t is only proposed that I should *recommend,* not prescribe a day of fasting & prayer. That is, that I should *indirectly* assume to the U. S. an authority over religious exercises which the Constitution has directly precluded from them. It must be meant too that this recommendation is to carry some authority, and to be sanctioned by some penalty on those who disregard it; not indeed of fine and imprisonment, but of some degree of proscription perhaps in public opinion." *Id.,* at 98–99 (emphasis in original).

By condemning such noncoercive state practices that, in "recommending" the majority faith, demean religious dissenters "in public opinion," Jefferson necessarily condemned what, in modern terms, we call official endorsement of religion. He accordingly construed the Establishment Clause to forbid not simply state coercion, but also state endorsement, of religious belief and observance.[5] And if he opposed

---

[5] Petitioners claim that the quoted passage shows that Jefferson regarded Thanksgiving proclamations as "coercive": "Thus, while one may disagree with Jefferson's view that a recommendatory Thanksgiving proclamation would nonetheless be coercive ... one cannot disagree that Jefferson believed coercion to be a necessary element of a First Amendment violation." Brief for Petitioners 34. But this is wordplay. The "proscription" to which Jefferson referred was, of course, by the public and not

impersonal Presidential addresses for inflicting "proscription in public opinion," all the more would he have condemned less diffuse expressions of official endorsement.

During his first three years in office, James Madison also refused to call for days of thanksgiving and prayer, though later, amid the political turmoil of the War of 1812, he did so on four separate occasions. See Madison's "Detached Memoranda" 562, and n. 54. Upon retirement, in an essay condemning as an unconstitutional "establishment" the use of public money to support congressional and military chaplains, *id.*, at 558–560,[6] he concluded that "[r]eligious procla-

---

the government, whose only action was a noncoercive recommendation. And one can call any act of endorsement a form of coercion, but only if one is willing to dilute the meaning of "coercion" until there is no meaning left. Jefferson's position straightforwardly contradicts the claim that a showing of "coercion," under any normal definition, is prerequisite to a successful Establishment Clause claim. At the same time, Jefferson's practice, like Madison's, see *infra* this page and 625, sometimes diverged from principle, for he did include religious references in his inaugural speeches. See Inaugural Addresses of the Presidents of the United States 17, 22–23 (1989); see also n. 3, *supra.*

Petitioners also seek comfort in a different passage of the same letter. Jefferson argued that Presidential religious proclamations violate not just the Establishment Clause, but also the Tenth Amendment, for "what might be a right in a state government, was a violation of that right when assumed by another." Letter from Thomas Jefferson to Rev. S. Miller (Jan. 23, 1808), in 5 The Founders' Constitution 99 (P. Kurland & R. Lerner eds. 1987). Jefferson did not, however, restrict himself to the Tenth Amendment in condemning such proclamations by a national officer. I do not, in any event, understand petitioners to be arguing that the Establishment Clause is exclusively a structural provision mediating the respective powers of the State and National Governments. Such a position would entail the argument, which petitioners do not make, and which we would almost certainly reject, that incorporation of the Establishment Clause under the Fourteenth Amendment was erroneous.

[6] Madison found this practice "a palpable violation of . . . Constitutional principles." Madison's "Detached Memoranda" 558. Although he sat on the committee recommending the congressional chaplainship, see R. Cord, Separation of Church and State: Historical Fact and Current Fiction 23

mations by the Executive recommending thanksgivings & fasts are shoots from the same root with the legislative acts reviewed. Altho' recommendations only, they imply a religious agency, making no part of the trust delegated to political rulers." *Id.*, at 560. Explaining that "[t]he members of a Govt . . . can in no sense, be regarded as possessing an advisory trust from their Constituents in their religious capacities," *ibid.*, he further observed that the state necessarily freights all of its religious messages with political ones: "the idea of policy [is] associated with religion, whatever be the mode or the occasion, when a function of the latter is assumed by those in power." *Id.*, at 562 (footnote omitted).

Madison's failure to keep pace with his principles in the face of congressional pressure cannot erase the principles. He admitted to backsliding, and explained that he had made the content of his wartime proclamations inconsequential enough to mitigate much of their impropriety. See *ibid.;* see also Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 105. While his writings suggest mild variations in his interpretation of the Establishment Clause, Madison was no different in that respect from the rest of his political generation. That he expressed so much doubt about the constitutionality of religious proclamations, however, suggests a brand of separationism stronger even than that embodied in our traditional jurisprudence. So too does his characterization of public subsidies for legislative and military chaplains as unconstitutional "establishments," see *supra,* at 624 and this page, and n. 6, for the federal courts, however expansive their general view of the Establishment Clause, have upheld both practices. See *Marsh* v. *Chambers,* 463 U. S. 783 (1983) (legislative chap-

---

(1988), he later insisted that "it was not with my approbation, that the deviation from [the immunity of religion from civil jurisdiction] took place in Congs., when they appointed Chaplains, to be paid from the Natl. Treasury." Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 105.

lains); *Katcoff* v. *Marsh,* 755 F. 2d 223 (CA2 1985) (military chaplains).

To be sure, the leaders of the young Republic engaged in some of the practices that separationists like Jefferson and Madison criticized. The First Congress did hire institutional chaplains, see *Marsh* v. *Chambers, supra,* at 788, and Presidents Washington and Adams unapologetically marked days of " 'public thanksgiving and prayer,' " see R. Cord, Separation of Church and State 53 (1988). Yet in the face of the separationist dissent, those practices prove, at best, that the Framers simply did not share a common understanding of the Establishment Clause, and, at worst, that they, like other politicians, could raise constitutional ideals one day and turn their backs on them the next. "Indeed, by 1787 the provisions of the state bills of rights had become what Madison called mere 'paper parchments'—expressions of the most laudable sentiments, observed as much in the breach as in practice." Kurland, The Origins of the Religion Clauses of the Constitution, 27 Wm. & Mary L. Rev. 839, 852 (1986) (footnote omitted). Sometimes the National Constitution fared no better. Ten years after proposing the First Amendment, Congress passed the Alien and Sedition Acts, measures patently unconstitutional by modern standards. If the early Congress's political actions were determinative, and not merely relevant, evidence of constitutional meaning, we would have to gut our current First Amendment doctrine to make room for political censorship.

While we may be unable to know for certain what the Framers meant by the Clause, we do know that, around the time of its ratification, a respectable body of opinion supported a considerably broader reading than petitioners urge upon us. This consistency with the textual considerations is enough to preclude fundamentally reexamining our settled law, and I am accordingly left with the task of considering whether the state practice at issue here violates our traditional understanding of the Clause's proscriptions.

## III

While the Establishment Clause's concept of neutrality is not self-revealing, our recent cases have invested it with specific content: the State may not favor or endorse either religion generally over nonreligion or one religion over others. See, *e. g., County of Allegheny,* 492 U. S., at 589–594, 598–602; *Texas Monthly,* 489 U. S., at 17 (plurality opinion); *id.,* at 28 (BLACKMUN, J., concurring in judgment); *Edwards* v. *Aguillard,* 482 U. S., at 593; *School Dist. of Grand Rapids,* 473 U. S., at 389–392; *Wallace* v. *Jaffree,* 472 U. S., at 61; see also Laycock, Formal, Substantive, and Disaggregated Neutrality Toward Religion, 39 DePaul L. Rev. 993 (1990); cf. *Lemon* v. *Kurtzman,* 403 U. S. 602, 612–613 (1971). This principle against favoritism and endorsement has become the foundation of Establishment Clause jurisprudence, ensuring that religious belief is irrelevant to every citizen's standing in the political community, see *County of Allegheny, supra,* at 594; J. Madison, Memorial and Remonstrance Against Religious Assessments (1785), in 5 The Founders' Constitution, at 82–83, and protecting religion from the demeaning effects of any governmental embrace, see *id.,* at 83. Now, as in the early Republic, "religion & Govt. will both exist in greater purity, the less they are mixed together." Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 106. Our aspiration to religious liberty, embodied in the First Amendment, permits no other standard.

## A

That government must remain neutral in matters of religion does not foreclose it from ever taking religion into account. The State may "accommodate" the free exercise of religion by relieving people from generally applicable rules that interfere with their religious callings. See, *e. g., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327 (1987); see also *Sherbert* v. *Verner,* 374 U. S. 398 (1963). Contrary to the

views of some,[7] such accommodation does not necessarily signify an official endorsement of religious observance over disbelief.

In everyday life, we routinely accommodate religious beliefs that we do not share. A Christian inviting an Orthodox Jew to lunch might take pains to choose a kosher restaurant; an atheist in a hurry might yield the right of way to an Amish man steering a horse-drawn carriage. In so acting, we express respect for, but not endorsement of, the fundamental values of others. We act without expressing a position on the theological merit of those values or of religious belief in general, and no one perceives us to have taken such a position.

The government may act likewise. Most religions encourage devotional practices that are at once crucial to the lives of believers and idiosyncratic in the eyes of nonadherents. By definition, secular rules of general application are drawn from the nonadherent's vantage and, consequently, fail to take such practices into account. Yet when enforcement of such rules cuts across religious sensibilities, as it often does, it puts those affected to the choice of taking sides between God and government. In such circumstances, accommodating religion reveals nothing beyond a recognition that general rules can unnecessarily offend the religious conscience when they offend the conscience of secular society not at all. Cf. *Welsh* v. *United States*, 398 U. S. 333, 340 (1970) (plurality opinion). Thus, in freeing the Native American Church from federal laws forbidding peyote use, see Drug Enforcement Administration Miscellaneous Exemptions, 21 CFR

---

[7] See, *e. g., Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 726 (1981) (REHNQUIST, J., dissenting); Choper, The Religion Clauses of the First Amendment: Reconciling the Conflict, 41 U. Pitt. L. Rev. 673, 685–686 (1980); see also *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 668–669 (1970); *Sherbert* v. *Verner*, 374 U. S. 398, 414, 416 (1963) (Stewart, J., concurring in result); cf. *Wallace* v. *Jaffree*, 472 U. S., at 83 (O'CONNOR, J., concurring in judgment).

§ 1307.31 (1991), the government conveys no endorsement of
peyote rituals, the Church, or religion as such; it simply
respects the centrality of peyote to the lives of certain
Americans. See Note, The Free Exercise Boundaries of
Permissible Accommodation Under the Establishment
Clause, 99 Yale L. J. 1127, 1135–1136 (1990).

## B

Whatever else may define the scope of accommodation per-
missible under the Establishment Clause, one requirement is
clear: accommodation must lift a discernible burden on the
free exercise of religion. See *County of Allegheny, supra,*
at 601, n. 51; *id.,* at 631–632 (O'CONNOR, J., concurring in
part and concurring in judgment); *Corporation of Presiding
Bishop, supra,* at 348 (O'CONNOR, J., concurring in judg-
ment); see also *Texas Monthly, supra,* at 18, 18–19, n. 8
(plurality opinion); *Wallace* v. *Jaffree, supra,* at 57–58, n. 45.
But see *County of Allegheny, supra,* at 663, n. 2 (KENNEDY,
J., concurring in judgment in part and dissenting in part).
Concern for the position of religious individuals in the
modern regulatory State cannot justify official solicitude
for a religious practice unburdened by general rules; such
gratuitous largesse would effectively favor religion over dis-
belief. By these lights one easily sees that, in sponsoring
the graduation prayers at issue here, the State has crossed
the line from permissible accommodation to unconstitu-
tional establishment.

Religious students cannot complain that omitting prayers
from their graduation ceremony would, in any realistic sense,
"burden" their spiritual callings. To be sure, many of them
invest this rite of passage with spiritual significance, but
they may express their religious feelings about it before and
after the ceremony. They may even organize a privately
sponsored baccalaureate if they desire the company of like-
minded students. Because they accordingly have no need
for the machinery of the State to affirm their beliefs, the

government's sponsorship of prayer at the graduation ceremony is most reasonably understood as an official endorsement of religion and, in this instance, of theistic religion. One may fairly say, as one commentator has suggested, that the government brought prayer into the ceremony "precisely because some people want a symbolic affirmation that government approves and endorses their religion, and because many of the people who want this affirmation place little or no value on the costs to religious minorities." Laycock, Summary and Synthesis: The Crisis in Religious Liberty, 60 Geo. Wash. L. Rev. 841, 844 (1992).[8]

Petitioners would deflect this conclusion by arguing that graduation prayers are no different from Presidential religious proclamations and similar official "acknowledgments" of religion in public life. But religious invocations in Thanksgiving Day addresses and the like, rarely noticed, ignored without effort, conveyed over an impersonal medium, and directed at no one in particular, inhabit a pallid zone worlds apart from official prayers delivered to a captive audience of public school students and their families. Madison himself respected the difference between the trivial and the serious in constitutional practice. Realizing that his con-

---

[8] If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State. Cf. *Witters* v. *Washington Dept. of Services for Blind,* 474 U. S. 481 (1986). But that is not our case. Nor is this a case where the State has, without singling out religious groups or individuals, extended benefits to them as members of a broad class of beneficiaries defined by clearly secular criteria. See *Widmar* v. *Vincent,* 454 U. S. 263, 274–275 (1981); *Walz, supra,* at 696 (opinion of Harlan, J.) ("In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter"). Finally, this is not a case like *Marsh* v. *Chambers,* 463 U. S. 783 (1983), in which government officials invoke spiritual inspiration entirely for their own benefit without directing any religious message at the citizens they lead.

temporaries were unlikely to take the Establishment Clause seriously enough to forgo a legislative chaplainship, he suggested that "[r]ather than let this step beyond the landmarks of power have the effect of a legitimate precedent, it will be better to apply to it the legal aphorism de minimis non curat lex . . . ." Madison's "Detached Memoranda" 559; see also Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 105. But that logic permits no winking at the practice in question here. When public school officials, armed with the State's authority, convey an endorsement of religion to their students, they strike near the core of the Establishment Clause. However "ceremonial" their messages may be, they are flatly unconstitutional.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE THOMAS join, dissenting.

Three Terms ago, I joined an opinion recognizing that the Establishment Clause must be construed in light of the "[g]overnment policies of accommodation, acknowledgment, and support for religion [that] are an accepted part of our political and cultural heritage." That opinion affirmed that "the meaning of the Clause is to be determined by reference to historical practices and understandings." It said that "[a] test for implementing the protections of the Establishment Clause that, if applied with consistency, would invalidate longstanding traditions cannot be a proper reading of the Clause." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 657, 670 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part).

These views of course prevent me from joining today's opinion, which is conspicuously bereft of any reference to history. In holding that the Establishment Clause prohibits invocations and benedictions at public school graduation ceremonies, the Court—with nary a mention that it is doing

so—lays waste a tradition that is as old as public school graduation ceremonies themselves, and that is a component of an even more longstanding American tradition of nonsectarian prayer to God at public celebrations generally. As its instrument of destruction, the bulldozer of its social engineering, the Court invents a boundless, and boundlessly manipulable, test of psychological coercion, which promises to do for the Establishment Clause what the *Durham* rule did for the insanity defense. See *Durham* v. *United States,* 94 U. S. App. D. C. 228, 214 F. 2d 862 (1954). Today's opinion shows more forcefully than volumes of argumentation why our Nation's protection, that fortress which is our Constitution, cannot possibly rest upon the changeable philosophical predilections of the Justices of this Court, but must have deep foundations in the historic practices of our people.

## I

Justice Holmes' aphorism that "a page of history is worth a volume of logic," *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921), applies with particular force to our Establishment Clause jurisprudence. As we have recognized, our interpretation of the Establishment Clause should "compor[t] with what history reveals was the contemporaneous understanding of its guarantees." *Lynch* v. *Donnelly,* 465 U. S. 668, 673 (1984). "[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *School Dist. of Abington* v. *Schempp,* 374 U. S. 203, 294 (1963) (Brennan, J., concurring). "[H]istorical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied" to contemporaneous practices. *Marsh* v. *Chambers,* 463 U. S. 783, 790 (1983). Thus, "[t]he existence from the beginning of the Nation's life of a practice, [while] not conclusive of its constitutionality . . .[,] is a fact of considerable import in the interpretation" of the

Establishment Clause. *Walz* v. *Tax Comm'n of New York City,* 397 U. S. 664, 681 (1970) (Brennan, J., concurring).

The history and tradition of our Nation are replete with public ceremonies featuring prayers of thanksgiving and petition. Illustrations of this point have been amply provided in our prior opinions, see, *e. g., Lynch, supra,* at 674–678; *Marsh, supra,* at 786–788; see also *Wallace* v. *Jaffree,* 472 U. S. 38, 100–103 (1985) (REHNQUIST, J., dissenting); *Engel* v. *Vitale,* 370 U. S. 421, 446–450, and n. 3 (1962) (Stewart, J., dissenting), but since the Court is so oblivious to our history as to suggest that the Constitution restricts "preservation and transmission of religious beliefs . . . to the private sphere," *ante,* at 589, it appears necessary to provide another brief account.

From our Nation's origin, prayer has been a prominent part of governmental ceremonies and proclamations. The Declaration of Independence, the document marking our birth as a separate people, "appeal[ed] to the Supreme Judge of the world for the rectitude of our intentions" and avowed "a firm reliance on the protection of divine Providence." In his first inaugural address, after swearing his oath of office on a Bible, George Washington deliberately made a prayer a part of his first official act as President:

> "[I]t would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe, who presides in the councils of nations, and whose providential aids can supply every human defect, that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes." Inaugural Addresses of the Presidents of the United States, S. Doc. 101–10, p. 2 (1989).

Such supplications have been a characteristic feature of inaugural addresses ever since. Thomas Jefferson, for example,

prayed in his first inaugural address: "[M]ay that Infinite Power which rules the destinies of the universe lead our councils to what is best, and give them a favorable issue for your peace and prosperity." *Id.*, at 17. In his second inaugural address, Jefferson acknowledged his need for divine guidance and invited his audience to join his prayer:

> "I shall need, too, the favor of that Being in whose hands we are, who led our fathers, as Israel of old, from their native land and planted them in a country flowing with all the necessaries and comforts of life; who has covered our infancy with His providence and our riper years with His wisdom and power, and to whose goodness I ask you to join in supplications with me that He will so enlighten the minds of your servants, guide their councils, and prosper their measures that whatsoever they do shall result in your good, and shall secure to you the peace, friendship, and approbation of all nations." *Id.*, at 22–23.

Similarly, James Madison, in his first inaugural address, placed his confidence

> "in the guardianship and guidance of that Almighty Being whose power regulates the destiny of nations, whose blessings have been so conspicuously dispensed to this rising Republic, and to whom we are bound to address our devout gratitude for the past, as well as our fervent supplications and best hopes for the future." *Id.*, at 28.

Most recently, President Bush, continuing the tradition established by President Washington, asked those attending his inauguration to bow their heads, and made a prayer his first official act as President. *Id.*, at 346.

Our national celebration of Thanksgiving likewise dates back to President Washington. As we recounted in *Lynch:*

"The day after the First Amendment was proposed, Congress urged President Washington to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God.' President Washington proclaimed November 26, 1789, a day of thanksgiving to 'offe[r] our prayers and supplications to the Great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions . . . .' " 465 U. S., at 675, n. 2 (citations omitted).

This tradition of Thanksgiving Proclamations—with their religious theme of prayerful gratitude to God—has been adhered to by almost every President. *Id.*, at 675, and nn. 2 and 3; *Wallace* v. *Jaffree, supra,* at 100–103 (REHNQUIST, J., dissenting).

The other two branches of the Federal Government also have a long-established practice of prayer at public events. As we detailed in *Marsh,* congressional sessions have opened with a chaplain's prayer ever since the First Congress. 463 U. S., at 787–788. And this Court's own sessions have opened with the invocation "God save the United States and this Honorable Court" since the days of Chief Justice Marshall. 1 C. Warren, The Supreme Court in United States History 469 (1922).

In addition to this general tradition of prayer at public ceremonies, there exists a more specific tradition of invocations and benedictions at public school graduation exercises. By one account, the first public high school graduation ceremony took place in Connecticut in July 1868—the very month, as it happens, that the Fourteenth Amendment (the vehicle by which the Establishment Clause has been applied against the States) was ratified—when "15 seniors from the Norwich Free Academy marched in their best Sunday suits and dresses into a church hall and waited through majestic music and long prayers." Brodinsky, Commencement Rites Obsolete? Not At All, A 10-Week Study Shows, 10 Updat-

ing School Board Policies, No. 4, p. 3 (Apr. 1979). As the Court obliquely acknowledges in describing the "customary features" of high school graduations, *ante*, at 583, and as respondents do not contest, the invocation and benediction have long been recognized to be "as traditional as any other parts of the [school] graduation program and are widely established." H. McKown, Commencement Activities 56 (1931); see also Brodinsky, *supra*, at 5.

## II

The Court presumably would separate graduation invocations and benedictions from other instances of public "preservation and transmission of religious beliefs" on the ground that they involve "psychological coercion." I find it a sufficient embarrassment that our Establishment Clause jurisprudence regarding holiday displays, see *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573 (1989), has come to "requir[e] scrutiny more commonly associated with interior decorators than with the judiciary." *American Jewish Congress* v. *Chicago*, 827 F. 2d 120, 129 (CA7 1987) (Easterbrook, J., dissenting). But interior decorating is a rock-hard science compared to psychology practiced by amateurs. A few citations of "[r]esearch in psychology" that have no particular bearing upon the precise issue here, *ante*, at 593, cannot disguise the fact that the Court has gone beyond the realm where judges know what they are doing. The Court's argument that state officials have "coerced" students to take part in the invocation and benediction at graduation ceremonies is, not to put too fine a point on it, incoherent.

The Court identifies two "dominant facts" that it says dictate its ruling that invocations and benedictions at public school graduation ceremonies violate the Establishment Clause. *Ante*, at 586. Neither of them is in any relevant sense true.

## A

The Court declares that students' "attendance and participation in the [invocation and benediction] are in a fair and real sense obligatory." *Ibid.* But what exactly is this "fair and real sense"? According to the Court, students at graduation who want "to avoid the fact or appearance of participation," *ante,* at 588, in the invocation and benediction are *psychologically* obligated by "public pressure, as well as peer pressure, . . . to stand as a group or, at least, maintain respectful silence" during those prayers. *Ante,* at 593. This assertion—*the very linchpin of the Court's opinion*—is almost as intriguing for what it does not say as for what it says. It does not say, for example, that students are psychologically coerced to bow their heads, place their hands in a Dürer-like prayer position, pay attention to the prayers, utter "Amen," or in fact pray. (Perhaps further intensive psychological research remains to be done on these matters.) It claims only that students are psychologically coerced "to stand ; . . . *or,* at least, maintain respectful silence." *Ibid.* (emphasis added). Both halves of this disjunctive (*both* of which must amount to the fact or appearance of participation in prayer if the Court's analysis is to survive on its own terms) merit particular attention.

To begin with the latter: The Court's notion that a student who simply *sits* in "respectful silence" during the invocation and benediction (when all others are standing) has somehow joined—or would somehow be perceived as having joined—in the prayers is nothing short of ludicrous. We indeed live in a vulgar age. But surely "our social conventions," *ibid.,* have not coarsened to the point that anyone who does not stand on his chair and shout obscenities can reasonably be deemed to have assented to everything said in his presence. Since the Court does not dispute that students exposed to prayer at graduation ceremonies retain (despite "subtle coercive pressures," *ante,* at 588) the free will to sit, cf. *ante,* at 593, there is absolutely no basis for the Court's

decision. It is fanciful enough to say that "a reasonable dissenter," standing head erect in a class of bowed heads, "could believe that the group exercise signified her own participation or approval of it," *ibid.* It is beyond the absurd to say that she could entertain such a belief while pointedly declining to rise.

But let us assume the very worst, that the nonparticipating graduate is "subtly coerced" . . . to stand! Even that half of the disjunctive does not remotely establish a "participation" (or an "appearance of participation") in a religious exercise. The Court acknowledges that "in our culture standing . . . can signify adherence to a view or simple respect for the views of others." *Ibid.* (Much more often the latter than the former, I think, except perhaps in the proverbial town meeting, where one votes by standing.) But if it is a permissible inference that one who is standing is doing so simply out of respect for the prayers of others that are in progress, then how can it possibly be said that a "reasonable dissenter . . . could believe that the group exercise signified her own participation or approval"? Quite obviously, it cannot. I may add, moreover, that maintaining respect for the religious observances of others is a fundamental civic virtue that government (including the public schools) can and should cultivate—so that even if it were the case that the displaying of such respect might be mistaken for taking part in the prayer, I would deny that the dissenter's interest in avoiding *even the false appearance of participation* constitutionally trumps the government's interest in fostering respect for religion generally.

The opinion manifests that the Court itself has not given careful consideration to its test of psychological coercion. For if it had, how could it observe, with no hint of concern or disapproval, that students stood for the Pledge of Allegiance, which immediately preceded Rabbi Gutterman's invocation? *Ante,* at 583. The government can, of course, no more coerce political orthodoxy than religious orthodoxy. *West*

*Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 642 (1943). Moreover, since the Pledge of Allegiance has been revised since *Barnette* to include the phrase "under God," recital of the Pledge would appear to raise the same Establishment Clause issue as the invocation and benediction. If students were psychologically coerced to remain standing during the invocation, they must also have been psychologically coerced, moments before, to stand for (and thereby, in the Court's view, take part in or appear to take part in) the Pledge. Must the Pledge therefore be barred from the public schools (both from graduation ceremonies and from the classroom)? In *Barnette* we held that a public school student could not be compelled to *recite* the Pledge; we did not even hint that she could not be compelled to observe respectful silence—indeed, even to *stand* in respectful silence—when those who wished to recite it did so. Logically, that ought to be the next project for the Court's bulldozer.

I also find it odd that the Court concludes that high school graduates may not be subjected to this supposed psychological coercion, yet refrains from addressing whether "mature adults" may. *Ante,* at 593. I had thought that the reason graduation from high school is regarded as so significant an event is that it is generally associated with transition from adolescence to young adulthood. Many graduating seniors, of course, are old enough to vote. Why, then, does the Court treat them as though they were first-graders? Will we soon have a jurisprudence that distinguishes between mature and immature adults?

## B

The other "dominant fac[t]" identified by the Court is that "[s]tate officials direct the performance of a formal religious exercise" at school graduation ceremonies. *Ante,* at 586. "Direct[ing] the performance of a formal religious exercise" has a sound of liturgy to it, summoning up images of the principal directing acolytes where to carry the cross, or showing the rabbi where to unroll the Torah. A Court professing to be

engaged in a "delicate and fact-sensitive" line-drawing, *ante,* at 597, would better describe what it means as "prescribing the content of an invocation and benediction." But even that would be false. All the record shows is that principals of the Providence public schools, acting within their delegated authority, have invited clergy to deliver invocations and benedictions at graduations; and that Principal Lee invited Rabbi Gutterman, provided him a two-page pamphlet, prepared by the National Conference of Christians and Jews, giving general advice on inclusive prayer for civic occasions, and advised him that his prayers at graduation should be nonsectarian. How these facts can fairly be transformed into the charges that Principal Lee "directed and controlled the content of [Rabbi Gutterman's] prayer," *ante,* at 588, that school officials "monitor prayer," *ante,* at 590, and attempted to "'compose official prayers,'" *ante,* at 588, and that the "government involvement with religious activity in this case is pervasive," *ante,* at 587, is difficult to fathom. The Court identifies nothing in the record remotely suggesting that school officials have ever drafted, edited, screened, or censored graduation prayers, or that Rabbi Gutterman was a mouthpiece of the school officials.

These distortions of the record are, of course, not harmless error: without them the Court's solemn assertion that the school officials could reasonably be perceived to be "enforc[ing] a religious orthodoxy," *ante,* at 592, would ring as hollow as it ought.

### III

The deeper flaw in the Court's opinion does not lie in its wrong answer to the question whether there was state-induced "peer-pressure" coercion; it lies, rather, in the Court's making violation of the Establishment Clause hinge on such a precious question. The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty.* Typically, attendance at the state

church was required; only clergy of the official church could lawfully perform sacraments; and dissenters, if tolerated, faced an array of civil disabilities. L. Levy, The Establishment Clause 4 (1986). Thus, for example, in the Colony of Virginia, where the Church of England had been established, ministers were required by law to conform to the doctrine and rites of the Church of England; and all persons were required to attend church and observe the Sabbath, were tithed for the public support of Anglican ministers, and were taxed for the costs of building and repairing churches. *Id.*, at 3–4.

The Establishment Clause was adopted to prohibit such an establishment of religion at the federal level (and to protect state establishments of religion from federal interference). I will further acknowledge for the sake of argument that, as some scholars have argued, by 1790 the term "establishment" had acquired an additional meaning—"financial support of religion generally, by public taxation"—that reflected the development of "general or multiple" establishments, not limited to a single church. *Id.*, at 8–9. But that would still be an establishment coerced *by force of law.* And I will further concede that our constitutional tradition, from the Declaration of Independence and the first inaugural address of Washington, quoted earlier, down to the present day, has, with a few aberrations, see *Church of Holy Trinity* v. *United States*, 143 U. S. 457 (1892), ruled out of order government-sponsored endorsement of religion—even when no legal coercion is present, and indeed even when no ersatz, "peer-pressure" psycho-coercion is present—where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ (for example, the divinity of Christ). But there is simply no support for the proposition that the officially sponsored nondenominational invocation and benediction read by Rabbi Gutterman—with no one legally coerced to recite

them—violated the Constitution of the United States. To the contrary, they are so characteristically American they could have come from the pen of George Washington or Abraham Lincoln himself.

Thus, while I have no quarrel with the Court's general proposition that the Establishment Clause "guarantees that government may not coerce anyone to support or participate in religion or its exercise," *ante*, at 587, I see no warrant for expanding the concept of coercion beyond acts backed by threat of penalty—a brand of coercion that, happily, is readily discernible to those of us who have made a career of reading the disciples of Blackstone rather than of Freud. The Framers were indeed opposed to coercion of religious worship by the National Government; but, as their own sponsorship of nonsectarian prayer in public events demonstrates, they understood that "[s]peech is not coercive; the listener may do as he likes." *American Jewish Congress* v. *Chicago*, 827 F. 2d, at 132 (Easterbrook, J., dissenting).

This historical discussion places in revealing perspective the Court's extravagant claim that the State has "for all practical purposes," *ante*, at 589, and "in every practical sense," *ante*, at 598, compelled students to participate in prayers at graduation. Beyond the fact, stipulated to by the parties, that attendance at graduation is voluntary, there is nothing in the record to indicate that failure of attending students to take part in the invocation or benediction was subject to any penalty or discipline. Contrast this with, for example, the facts of *Barnette:* Schoolchildren were required by law to recite the Pledge of Allegiance; failure to do so resulted in expulsion, threatened the expelled child with the prospect of being sent to a reformatory for criminally inclined juveniles, and subjected his parents to prosecution (and incarceration) for causing delinquency. 319 U. S., at 629–630. To characterize the "subtle coercive pressures," *ante*, at 588, allegedly present here as the "practical" equiva-

lent of the legal sanctions in *Barnette* is . . . well, let me just say it is not a "delicate and fact-sensitive" analysis.

The Court relies on our "school prayer" cases, *Engel* v. *Vitale,* 370 U. S. 421 (1962), and *School Dist. of Abington* v. *Schempp,* 374 U. S. 203 (1963). *Ante,* at 592. But whatever the merit of those cases, they do not support, much less compel, the Court's psycho-journey. In the first place, *Engel* and *Schempp* do not constitute an exception to the rule, distilled from historical practice, that public ceremonies may include prayer, see *supra,* at 633–636; rather, they simply do not fall within the scope of the rule (for the obvious reason that school instruction is not a public ceremony). Second, we have made clear our understanding that school prayer occurs within a framework in which legal coercion to attend school (*i. e.,* coercion under threat of penalty) provides the ultimate backdrop. In *Schempp,* for example, we emphasized that the prayers were "prescribed as part of the curricular activities of students who are *required by law* to attend school." 374 U. S., at 223 (emphasis added). *Engel's* suggestion that the school prayer program at issue there—which permitted students "to remain silent or be excused from the room," 370 U. S., at 430—involved "indirect coercive pressure," *id.,* at 431, should be understood against this backdrop of legal coercion. The question whether the opt-out procedure in *Engel* sufficed to dispel the coercion resulting from the mandatory attendance requirement is quite different from the question whether forbidden coercion exists in an environment *utterly devoid of legal compulsion.* And finally, our school prayer cases turn in part on the fact that the classroom is inherently an instructional setting, and daily prayer there—where parents are not present to counter "the students' emulation of teachers as role models and the children's susceptibility to peer pressure," *Edwards* v. *Aguillard,* 482 U. S. 578, 584 (1987)—might be thought to raise special concerns regarding state interference with the liberty of parents to direct the religious upbringing of their children: "Families entrust pub-

lic schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Ibid.;* see *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925). Voluntary prayer at graduation—a one-time ceremony at which parents, friends, and relatives are present—can hardly be thought to raise the same concerns.

## IV

Our Religion Clause jurisprudence has become bedeviled (so to speak) by reliance on formulaic abstractions that are not derived from, but positively conflict with, our long-accepted constitutional traditions. Foremost among these has been the so-called *Lemon* test, see *Lemon* v. *Kurtzman,* 403 U. S. 602, 612–613 (1971), which has received well-earned criticism from many Members of this Court. See, *e. g.,* *County of Allegheny,* 492 U. S., at 655–656 (opinion of KEN-NEDY, J.); *Edwards* v. *Aguillard, supra,* at 636–640 (SCALIA, J., dissenting); *Wallace* v. *Jaffree,* 472 U. S., at 108–112 (REHNQUIST, J., dissenting); *Aguilar* v. *Felton,* 473 U. S. 402, 426–430 (1985) (O'CONNOR, J., dissenting); *Roemer* v. *Board of Pub. Works of Md.,* 426 U. S. 736, 768–769 (1976) (WHITE, J., concurring in judgment). The Court today demonstrates the irrelevance of *Lemon* by essentially ignoring it, see *ante,* at 587, and the interment of that case may be the one happy byproduct of the Court's otherwise lamentable decision. Unfortunately, however, the Court has replaced *Lemon* with its psycho-coercion test, which suffers the double disability of having no roots whatever in our people's historic practice, and being as infinitely expandable as the reasons for psychotherapy itself.

Another happy aspect of the case is that it is only a jurisprudential disaster and not a practical one. Given the odd basis for the Court's decision, invocations and benedictions will be able to be given at public school graduations next

June, as they have for the past century and a half, so long as school authorities make clear that anyone who abstains from screaming in protest does not necessarily participate in the prayers. All that is seemingly needed is an announcement, or perhaps a written insertion at the beginning of the graduation program, to the effect that, while all are asked to rise for the invocation and benediction, none is compelled to join in them, nor will be assumed, by rising, to have done so. That obvious fact recited, the graduates and their parents may proceed to thank God, as Americans have always done, for the blessings He has generously bestowed on them and on their country.

\*    \*    \*

The reader has been told much in this case about the personal interest of Mr. Weisman and his daughter, and very little about the personal interests on the other side. They are not inconsequential. Church and state would not be such a difficult subject if religion were, as the Court apparently thinks it to be, some purely personal avocation that can be indulged entirely in secret, like pornography, in the privacy of one's room. For most believers it is *not* that, and has never been. Religious men and women of almost all denominations have felt it necessary to acknowledge and beseech the blessing of God as a people, and not just as individuals, because they believe in the "protection of divine Providence," as the Declaration of Independence put it, not just for individuals but for societies; because they believe God to be, as Washington's first Thanksgiving Proclamation put it, the "Great Lord and Ruler of Nations." One can believe in the effectiveness of such public worship, or one can deprecate and deride it. But the longstanding American tradition of prayer at official ceremonies displays with unmistakable clarity that the Establishment Clause does not forbid the government to accommodate it.

The narrow context of the present case involves a community's celebration of one of the milestones in its young citi-

zens' lives, and it is a bold step for this Court to seek to banish from that occasion, and from thousands of similar celebrations throughout this land, the expression of gratitude to God that a majority of the community wishes to make. The issue before us today is not the abstract philosophical question whether the alternative of frustrating this desire of a religious majority is to be preferred over the alternative of imposing "psychological coercion," or a feeling of exclusion, upon nonbelievers. Rather, the question is *whether a mandatory choice in favor of the former has been imposed by the United States Constitution.* As the age-old practices of our people show, the answer to that question is not at all in doubt.

I must add one final observation: The Founders of our Republic knew the fearsome potential of sectarian religious belief to generate civil dissension and civil strife. And they also knew that nothing, absolutely nothing, is so inclined to foster among religious believers of various faiths a toleration—no, an affection—for one another than voluntarily joining in prayer together, to the God whom they all worship and seek. Needless to say, no one should be compelled to do that, but it is a shame to deprive our public culture of the opportunity, and indeed the encouragement, for people to do it voluntarily. The Baptist or Catholic who heard and joined in the simple and inspiring prayers of Rabbi Gutterman on this official and patriotic occasion was inoculated from religious bigotry and prejudice in a manner that cannot be replicated. To deprive our society of that important unifying mechanism, in order to spare the nonbeliever what seems to me the minimal inconvenience of standing or even sitting in respectful nonparticipation, is as senseless in policy as it is unsupported in law.

For the foregoing reasons, I dissent.