**Tamara Brackett BYAR Plaintiff**

v.

**Andy LEE, Former Sheriff of Benton County, Arkansas, in his official and individual capacities Defendant**

No. CIV.03–5263.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Sept. 9, 2004.

N. Doug Norwood, Norwood & Norwood, P.A., Rogers, AR, for Plaintiff.

Jason Owens, Duncan & Rainwater, Little Rock, AR, for Defendant.

### ORDER

HENDREN, District Judge.

Now on this 9 day of September, 2004, come on for consideration defendant's **Motion For Summary Judgment** (document # 6) and **Plaintiff's Motion For Summary Judgment** (document # 9), and from said motions, the supporting documentation, and the responses thereto, the Court finds and orders as follows:

1. Plaintiff brought this suit pursuant to 42 U.S.C. § 1983, alleging that her constitutional rights were violated by the "Detainee Rules" of the Benton County Jail, alleged to have been promulgated by defendant in his capacity as "chief policymaker for Benton County in the area of law enforcement and the operation of the county jail." Plaintiff was required to read, sign, and follow these Rules while she was detained in the facility. She seeks declaratory, compensatory and punitive relief, as well as costs and attorney fees.

Defendant denied the material allegations of the Complaint, and both parties have moved for summary judgment.

2. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Walsh v. United States,* 31 F.3d 696 (8th Cir.1994). Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir.1995). The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. *City of Mt. Pleasant, Iowa v. Associated Electric Co-op.,* 838 F.2d 268 (8th Cir.1988).

3. Pursuant to Local Rule 56.1, the parties filed statements of facts which they contend are not in dispute. From those statements, the uncontested allegations of the Complaint, and undisputed evidence

before the Court, the following significant undisputed facts are made to appear:

* Plaintiff was booked into the Benton County Detention Center ("BCDC") on November 18, 2001. While being booked, she was required to read and sign a copy of the Benton County Detainee Rules ("Detainee Rules" or "Rules").

* The Detainee Rules were promulgated by defendant, who was the elected Sheriff of Benton County, Arkansas, from January 1, 1989, until December 31, 2002. Defendant concedes that the Detainee Rules were modeled after the Ten Commandments.

* This was not defendant's first attempt at using the Ten Commandments as model rules for the BCDC. In April, 1998, he had caused the Ten Commandments—almost verbatim—to become the first 10 rules of the BCDC. A lawsuit followed the posting of those rules, styled *Ashford v. Benton County Sheriff Andy Lee* (Benton County Circuit Court Case No. CIV–98–261) (the "Ashford Case").

* Shortly before a hearing on May 1, 1998 in the Ashford Case, defendant—in consultation with legal counsel—reworded these ten rules in an effort to bring them into compliance with law. Defendant acknowledged at the hearing, however, that the revised rules were intended to track the Ten Commandments and that they were analogous to the Ten Commandments.

* While the issue raised in the Ashford Case was whether the rules then under consideration violated the Arkansas Constitution rather than the United States Constitution, defendant's counsel cited, quoted from and relied upon the decision of the United States Supreme Court in *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

* After hearing proof and arguments of counsel at the May 1, 1998, hearing in the Ashford Case, Judge Clinger stated:

I think that several things are, are clear from the evidence that has been presented and that is that Sheriff Lee, for whatever reason, has interjected himself into the religious business.

\*    \*    \*    \*    \*    \*

I am confident that when the announcement was made that the Ten Commandments would govern behavior in the jail that Sheriff Lee knew, anticipated, perhaps even desired, litigation, because in today's climate as you made remark, Mr. Rainwater, about the proliferation of jail lawsuits, it is clear that this is the type of rule making that is going to provoke jail lawsuits, and here we are.

The violations it appears to me were so blatant that on the eve of our hearing there was an attempt to modify these religious rules in an attempt to meet constitutional or statutory muster without, without in any way taking away from their religious overtones of the message in each rule.

\*    \*    \*    \*    \*    \*

... these rules, as modified, are being promulgated with the religious connotations being in large bold letters and the saving grace words, the words that attempt to pass constitutional and statutory muster, in fine print.

\*    \*    \*    \*    \*    \*

... legitimate rules, all except for Satan ritual and killing, were already covered in plain, easy to read and easy to understand rules of conduct which are still in full force and effect which means these rules are redundant and duplicative and can only lead to confusion.

\*    \*    \*    \*    \*    \*

I am also of the opinion that as long as you have part of the rules that lead off written in the religious terminology of the Bible, then followed by straight standard secular language on all other rules, that there is a religious emphasis that is prohibited in my opinion.

\* In another case challenging defendant's use of the Ten Commandments as a model for the rules of the BCDC, styled *Elliott v. Andy Lee,* et al., United States District Court for the Western District of Arkansas, case number 02–5152 (the "Elliott Case"), defendant testified by deposition on April 23, 2003, that when he posted the Ten Commandments, he was thinking "if these men and women who were in the jail would only follow the Ten Commandments, then they wouldn't ever be back in jail."

\* When plaintiff was booked into the BCDC on November 19, 2001, there were eleven Detainee Rules. Like the rules under consideration in the Ashford Case and the Elliott Case, these Rules were clearly modeled after the Ten Commandments. The first ten—in their opening phrases—begin with the same language as one translation of the corresponding Ten Commandments from the Book of Exodus in the Bible. The second through the tenth Rules, in their initial dictates, track the second through the tenth Commandments, although each Rule contains many more requirements and prohibitions than do the corresponding Commandments. These additional prohibitions are tailored to the security needs of a detention facility.[1]

\* Plaintiff was held in the BCDC for two days. During her detention she did not violate any of the Detainee Rules, nor would she have comported herself any differently had the Detainee Rules not existed.

\* Plaintiff is an adherent of the Southern Baptist faith, and the position of her faith—as well as her own position—with regard to the Ten Commandments is that they should be obeyed.

\* Plaintiff did not feel that the Detainee Rules expressed disapproval of her religious choices.

\* After defendant left office and was succeeded by a new sheriff on January 1, 2003, the Detainee Rules were again changed, and there is no suggestion that the current version of the rules is in any way modeled after the Ten Commandments.

■ 4. Defendant challenges plaintiff's standing to bring her claims, and that argument—being jurisdictional—must be addressed before any other.

Standing is an inescapable component of the jurisdiction of an Article III court, which exists to resolve cases or controversies. "[C]ourts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments ... are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court...." *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (internal citations omitted).

---

1. For example, the second Detainee Rule reads: "Thou shalt not make unto thee any graven image or carve any object; Shalt not possess any weapon, ammunition or explosive substance; shalt not make or possess any unprescribed narcotic, medicine or drug paraphenalia (sic); shalt not make or possess any intoxicant; shalt not misuse any authorized medicine; shalt not deface, mark on or place any substance whatsoever on doors, walls, fixtures, or other part of the jail facility, and shall not introduce, possess or conceal any unauthorized objects of any king (sic); shalt not cross any red lines without permission, you shall walk with your hands behind your back when leaving your cell block."

Standing has three elements:

\* Plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical.

\* There must be a causal connection between the injury and the conduct complained of.

\* It must be likely, as opposed to merely speculative, that the injury will be redressed by a decision in plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Applying the facts of this case to the law expressed in *Lujan*, the Court concludes that plaintiff has standing to sue.

■ The "injury in fact" requirement is satisfied because plaintiff, while detained in the BCDC, was required to read and sign the Detainee Rules which would govern her conduct during her stay at the BCDC. She was, therefore, directly affected by the Detainee Rules, rather than merely interested in the matter. Nor does it detract from her standing that she was not forced to obey religious tenets in which she did not believe. See, e.g., *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) ("Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is vio-

lated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not"). See also, *Lee v. Weisman*, 505 U.S. 577, 604, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Blackmun, J., concurring) (proof of government coercion not necessary to prove an Establishment Clause violation).

■ The invasion complained of by plaintiff was not merely conjectural or hypothetical. While the Detainee Rules did not vary from plaintiff's own religious beliefs, she testified she considered it offensive to have the government direct her to obey those tenets. Moreover, plaintiff expressed the fear that she might be perceived as violating them [2], with the result that she could be disciplined. Thus her injury was sufficiently concrete and particularized to give her standing to challenge the Detainee Rules. *School District of Abington Township, Pa. v. Schempp*, 374 U.S. 203, fn. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (the interests of school children and their parents, who are directly affected by the laws and practices against which their complaints are directed, give the parties standing to complain).

It follows, from what has been said, that plaintiff suffered an actual and concrete invasion of a legally protected interest. It also follows that there is a sufficient nexus between the conduct complained of (the requirement that plaintiff read, sign, and

---

**2.** Defendant's deposition testimony suggests that plaintiff was not exaggerating the situation with her concerns about inadvertently violating a Detainee Rule. For example, when asked what a detainee would have to do to follow the fifth Detainee Rule ("Honor thy father and thy mother when they come to visit you in jail, by treating them in a manner that is outwardly respectful; obey the lawful orders of the jail staff; and keep yourself and your living area clean"), defendant twice stated that it would be "subjective," and that it was "kind of a tough question to answer."

When asked how a detainee would know when she was stepping over the line of "coveting" as prohibited by Detainee Rule ten ("Thou shalt not covet any property in the physical, in-the-jail possession of a fellow detainee without giving the jail staff notice of any perceived unequal treatment with respect to detainee access to jail properties or jail facilities; shalt not gamble; and shalt not tamper with property of another"), defendant answered "If it rises to a problem, then we deal with it."

agree to follow the Detainee Rules) and the injury suffered (the offense offered to plaintiff by having religious tenets forced upon her in the guise of secular rules of behavior and her uncertainty about whether she might inadvertently violate them).

■ As for redressability, it is argued by defendant that plaintiff suffered no actual damages in the matter and thus a judgment in her favor would not redress her injury. The Court does not agree. Plaintiff seeks an award of compensatory damages and claims that, at the very least, she is entitled to nominal damages. Even if it be true, as urged by defendant, that plaintiff can prove no "actual injury," it is also true, as urged by plaintiff, that nominal damages may be awarded for a constitutional tort in the absence of actual injury. *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).

*Stachura* also recognizes that § 1983 allows compensation for mental and emotional distress in addition to more easily quantifiable forms of damage such as lost wages. In the Court's view, the authorities do not foreclose the possibility that one who accepts the Ten Commandments as appropriate religious teachings might still feel mental distress that they are being used to frame or promote rules of conduct by a governmental entity operating a detention facility. The two positions are certainly not incompatible, especially when one considers the fact that "the 'first and most immediate purpose (of the Establishment Clause) rested on the belief that a union of government and religion tends to destroy government and to degrade religion.'" *Schempp, supra*, 374 U.S. at 221, 83 S.Ct. 1560. Accordingly, the Court rejects defendant's contention that plaintiff cannot prove an injury which would be redressed by a decision in her favor, and finds that plaintiff does have standing to bring this suit.

■ 5. Defendant next contends that plaintiff's claims are moot, because the Detainee Rules have been replaced by a new set of rules instituted by a new sheriff, and plaintiff has long since been released from the BCDC.

■ The Court agrees that plaintiff's claim for injunctive relief is moot, pursuant to *Martin v. Sargent*, 780 F.2d 1334 (8th Cir.1985). However, as noted by the court in *Martin*, that result does not undermine a plaintiff's standing to bring a claim for money damages. Accordingly, the Court rejects defendant's argument that the entire matter is moot.

■ 6. Defendant next argues that he is entitled to qualified immunity with respect to plaintiff's claims. Qualified immunity is an affirmative defense which will defeat a constitutional claim unless the government official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the plaintiff. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Stated in terms of the facts of this case, defendant is entitled to qualified immunity unless he knew or reasonably should have known that the promulgation of the Detainee Rules would violate plaintiff's rights under the Establishment Clause of the First Amendment.

In determining whether defendant knew or reasonably should have known—when he promulgated the Detainee Rules in language which specifically calls to mind the Ten Commandments—that he would thereby run afoul of the Establishment Clause, the Court looks to the language of *Schempp, supra*. The Court therein carefully reviewed Establishment Clause jurisprudence. A few quotations from that case will demonstrate that it has long been the considered law of this land that the State must refrain from using its power to

either *advance* or *curtail* the goals of religious groups:

First, this Court has decisively settled that the First Amendment's mandate that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof' has been made wholly applicable to the States by the Fourteenth Amendment.

\*   \*   \*   \*   \*   \*

Second, this Court has rejected unequivocally the contention that the Establishment Clause forbids only governmental preference of one religion over another. Almost 20 years ago in Everson, the Court said that '(n)either a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.'

\*   \*   \*   \*   \*   \*

... the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. \* \* \* This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity.'

\*   \*   \*   \*   \*   \*

... the 'scope of the First Amendment \* \* \* was designed forever to suppress' the establishment of religion or the prohibition of the free exercise thereof. In short, the Court held that the Amendment 'requires the state to be neutral in its relations with groups of religious believers and non-believers...'

\*   \*   \*   \*   \*   \*

... as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private.

\*   \*   \*   \*   \*   \*

Finally, in *Engle v. Vitale*, only last year, these principles were so universally recognized that the Court, without the citation of a single case and over the sole dissent of Mr. Justice STEWART, reaffirmed them.

374 U.S. 203, 215–221, 83 S.Ct. 1560, 10 L.Ed.2d 844 (internal citations omitted).

Notwithstanding the foregoing precedent, defendant contends that the Detainee Rules were secular in nature and that his avowed purpose of including therein language analogous to the Ten Commandments was not of a religious nature. Not only is this contention belied by his testimony in the Elliott Case that if people would follow the Ten Commandments they would not ever be back in jail, it overlooks the specific holding of the United States Supreme Court in *Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). In that case, the Court struck down a Kentucky statute which required the posting of a copy of the Ten Commandments, purchased with private contributions, on the wall of each public classroom in the State. After referring to the three-part test it had announced in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (as discussed, *infra*), the Court rejected Kentucky's contention that the avowed purpose of the statute was secular. Citing *Schempp*, supra, the Court said that such an "avowed" secular purpose is not sufficient to avoid conflict with the First Amendment. The Court then said:

The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a

supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12–17; Deuteronomy 5: 16–21. Rather, the first part of the Commandments concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1–11; Deuteronomy 5: 6–15.

This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like. *Abington School District v. Schempp, supra,* at 225, 83 S.Ct. 1560. Posting of religious texts on the wall serves no such educational function. *If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, mediate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.*

449 U.S. at 42, 101 S.Ct. 192 (emphasis added).

In light of *Stone,* the Court cannot accept defendant's contention that his "avowed" purpose for couching the Detainee Rules in language intended to track or be analogous to the Ten Commandments was secular and thus not in conflict with the Establishment Clause. In the Court's view, the 1980 *Stone* opinion (particularly the emphasized portions of the quotation set out above), clearly provided notice that posting the Ten Commandments, verbatim or in analogous form, in a government facility, and requiring citizens detained there to read and obey them, would violate the Establishment Clause.

Defendant cannot reasonably claim that he was unaware of *Stone* and its requirements, given his history with the Ashford Case. Judge Clinger there stated that "as long as you have part of the rules that lead off written in the religious terminology of the Bible, then followed by straight standard secular language on all other rules, that there is a religious emphasis that is prohibited in my opinion." Judge Clinger repeatedly described the rules therein under consideration as "a thinly disguised religious statement."

In light of Judge Clinger's pointed comments in the Ashford Case—made after defendant's attorney cited, discussed and relied upon *Stone*—the Court sees no basis for any finding that defendant did not know that the contents of the Detainee Rules would run afoul of the First Amendment. To the contrary, the Court has no hesitancy in concluding that defendant knew, or reasonably should have known, that the Detainee Rules would violate plaintiff's rights under the Establishment Clause of the First Amendment. The Court, therefore, concludes that defendant is not entitled to the protection of the defense of qualified immunity in this matter.

7. The Court now turns to an analysis of the parties' opposing motions for summary judgment.

Both claim entitlement to victory on the merits of the case. Plaintiff says the proof shows the defendant violated the Establishment Clause and caused her injury for which she is entitled to relief. Defendant says the same proof shows that he did not violate the Establishment Clause, but that if he did, plaintiff suffered no injury thereby.

The parties agree that *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), states the appropriate test for a violation of the Establishment Clause. According to *Lemon*, a law (or a governmentally promulgated rule, as in this case) will pass muster under the Establishment Clause if it meets three criteria:

* it has a secular purpose;
* its primary effect neither advances nor inhibits religion; and
* it does not foster excessive government entanglement with religion.

Summing up what these criteria require, it was said in *Lemon* that the "Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn."

Defendant takes the position that the Detainee Rules are not a religious document (i.e., they are not "the" Ten Commandments, and there is "nothing about any of the subject rules that could reasonably be categorized as uniquely religious"). The Court has already rejected these arguments in its ruling on the question of qualified immunity. In light of the cases cited in ¶ 6, *supra*, these arguments are untenable.

Defendant also argues that the Rules "bear only a minimal, form relationship to the Ten Commandments" so as to be "personal, mandatory, and restrictive," "more memorable and authoritative," and "readily understood and remembered in an area of the state and nation where most people are familiar with the format and distinctive wording ('Thou shalt not') of the Ten Commandments."

■ In the Court's view, the foregoing arguments demonstrate how and why the Detainee Rules under discussion are excessively and impermissibly entangled with—and constitute an endorsement or advancement of—religion. Despite defendant's apparently sincere contention that his purpose was essentially secular, his own testimony reveals that the Detainee Rules were written as they were to take advantage of the widespread power and influence of the Ten Commandments as a sacred text in the Jewish and Christian faiths.

In addition, the particular use to which the Biblical precepts were put by inclusion in the Detainee Rules takes them, in the Court's view, even beyond the tenets of *Stone*. The *Stone* opinion described "honoring one's parents" and "covetousness" as "arguably secular matters," but such conduct is of little or no significance in terms of jail security or order. While defendant contends that failing to honor one's parents, or covetousness, could lead to fights, it would be simpler—and would avoid any entanglement with religion—to simply make a rule against fighting.

The Court, therefore, rejects these arguments and, instead, concludes that the use of Biblical language and the Ten Commandments as a model for the Detainee Rules served no secular purpose, because rules of conduct could have been simply and clearly stated without reliance on the Ten Commandments. Further, the Court believes the primary effect of the Rules was to advance religion since they addressed conduct which has little or no bearing on jail order or security. Finally, the Court concludes that inclusion of patently religious material in the text of the Rules constituted excessive entanglement with religion, since there was no need to involve religious rules, precepts or materials in the jail rules at all.

Given the ease and simplicity with which jail rules could have been formulated without reliance on the Ten Commandments and the inclusion of precepts which (although advancing no legitimate purpose of a detention facility) intentionally track cen-

tral teachings of the Bible, the Court concludes that the Detainee Rules do not pass the test of *Lemon v. Kurtzman*. It follows that requiring plaintiff to read, sign, and obey the Detainee Rules violated her rights under the Establishment Clause of the First Amendment.

8. Based upon the foregoing analysis, the Court concludes that the motions under discussion should be resolved as follows:

(a) Defendant's Motion For Summary Judgment should be granted with respect to plaintiff's claim for injunctive relief and denied in all other respects.

(b) Plaintiff's Motion For Summary Judgment should be granted with respect to her claim for damages in a nominal amount, and denied with respect to her claim for injunctive relief.

(c) While finding that plaintiff is entitled to nominal damages as a matter of law, the submissions of the parties do not resolve the issue of whether plaintiff suffered emotional distress entitling her to damages in more than a nominal amount. The Court will, therefore, allow plaintiff the option of electing to receive an award of nominal damages as a matter of law, or proceeding to trial on the issue of actual damages. Notice of this election is to be filed within ten (10) days of the date of this Order.

**IT IS THEREFORE ORDERED** that defendant's **Motion For Summary Judgment** (document # 6) is **granted in part and denied in part**. The Motion is granted insofar as it seeks dismissal of plaintiff's claim for injunctive relief, and **denied** in all other respects.

**IT IS FURTHER ORDERED** that Plaintiff's **Motion For Summary Judgment** (document # 9) is granted in part and denied in part. The Motion is granted insofar as plaintiff seeks an award of nominal damages, and **denied** insofar as she seeks injunctive relief.

**IT IS FURTHER ORDERED** that plaintiff may elect whether she wishes to present her claims for emotional distress to a jury, or to accept solely a nominal damages award by the Court as a matter of law. Plaintiff is directed to notify the Court in writing of her election between these two options within ten (10) days of the date of this Order.

**IT IS SO ORDERED.**